**Rogelio CANNADY, Appellant,**

v.

**The STATE of Texas.**

No. 73011.

Court of Criminal Appeals of Texas.

Jan. 5, 2000.

Rehearing Denied March 8, 2000.

Debbie S. Holmes, Staff Atty., Huntsville, for appellant.

**1.** Tᴇx. Pᴇɴᴀʟ Cᴏᴅᴇ Aɴɴ. § 19.03(a); Art. 37.071 § 2(g). Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

Herb Hancock, Asst. Dist. Atty., Beeville, Matthew Paul, State's Atty., Austin, for State.

## *O P I N I O N*

KEASLER, J., delivered the unanimous opinion of the Court.

Rogelio Cannady was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Cannady raises nine points of error in his original brief and ten additional points in his supplemental brief. He does not challenge the sufficiency of the evidence to support his conviction or his punishment. We affirm.

## HISTORICAL FACTS

On January 22, 1991, Cannady was convicted for two murders he committed on June 29, 1990. He received a life sentence for each conviction. On October 10, 1993, Cannady killed a fellow inmate while in prison and was charged with committing capital murder under Texas Penal Code § 19.03(a)(6). The version of the statute under which Cannady was indicted read as follows:

> (a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:
>
> &#42; &#42; &#42;
>
> (6) the person, while serving a sentence of life imprisonment or a term of 99 years for the commission of any offense listed in Section 3g(a)(1), Article 42.12, Code of Criminal Procedure, murders another; . . . .

This statute became effective September 1, 1993, and the "3g(a)(1)" offenses included murder, capital murder, indecency with a child, aggravated kidnapping, aggravated sexual assault, and aggravated robbery. Murder and indecency with a child were

**2.** Art. 37.071 § 2(h).

both added to Art. 42.12 effective September 1, 1993.

Before trial, Cannady filed a motion alleging that the offenses for which he received his life sentences, and on which the capital murder indictment relied, were committed before September 1, 1993. Because serving a life sentence for a particular crime is an element of capital murder under Texas Penal Code § 19.03(a)(6), and because the offenses for which he received his life sentences were committed before September 1, 1993, but were not "§ 3(g)(1)" offenses until September 1, 1993, Cannady asserted that he was not subject to a capital murder charge. Therefore, Cannady argued, the allegations in the indictment should be quashed. On January 27, 1995, the trial judge agreed with Cannady's assessment and quashed the aggravating elements in the indictment, leaving the murder charge intact.

The State appealed the trial court's ruling and the Thirteenth Court of Appeals reversed.[3] The Court of Appeals held that the date on which the prior offenses were committed was not an element of capital murder, nor was Cannady deprived of notice that he could be charged with capital murder.[4] So application of the statute to Cannady did not violate the *ex post facto* laws. Cannady's petition for discretionary review to this Court was refused, as was his petition for writ of certiorari in the United States Supreme Court.[5] Cannady was tried and convicted of capital murder and sentenced to death on December 5, 1997.

## APPLICATION OF STATUTE

█ The basic contention underlying Cannady's first four points of error is his assertion that the date he committed the offenses for which he received his two life sentences is an element of capital murder under Texas Penal Code § 19.03(a)(6). The Thirteenth Court of Appeals rejected this precise contention and we adopt the reasoning of that opinion in resolving these four points.[6] Points of error one through four are overruled.

## CHALLENGES FOR CAUSE

In points of error six through eight and supplemental point of error one, Cannady complains that the trial court erred in denying his challenges for cause to four different veniremembers. To preserve error on this issue, Cannady must demonstrate on the record that he asserted a clear and specific challenge for cause, that he used a peremptory challenge on the complained-of veniremember, that all his peremptory challenges were exhausted, that his request for additional strikes was denied, and that an objectionable juror sat on the jury.[7] Cannady asserts in his fifth point of error that he did preserve error with regard to the four points he raises concerning erroneously denied challenges for cause. But whether any error is preserved is a preliminary question to be answered within the analysis of the challenge and not as a wholly separate question. Because this point does not assert alleged error, it is overruled.

█ The record shows that, some time after the parties accepted the ninth juror, Cannady exhausted his fifteenth peremptory challenge. Cannady then requested five additional challenges and received two. After using those challenges, Cannady again requested additional challenges, but the request was denied. The twelfth juror

3. *State v. Cannady*, 913 S.W.2d 741 (Tex. App.—Corpus Christi 1996, pet. ref'd).

4. *See Cannady*, 913 S.W.2d at 744.

5. *Cannady v. Texas*, 519 U.S. 1060, 117 S.Ct. 694, 136 L.Ed.2d 617 (1997).

6. *Cannady, supra; see also Proctor v. State*, 967 S.W.2d 840, 844 (Tex.Crim.App.1998) and *State v. Mason*, 980 S.W.2d 635, 640–641 (Tex.Crim.App.1998).

7. *Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997).

was seated shortly thereafter over Cannady's objection. We find Cannady has preserved error with regard to these points.

■ When the trial judge errs in overruling a challenge for cause against a veniremember, the defendant is harmed only if he uses a peremptory strike to remove the veniremember and then suffers a detriment from the loss of the strike.[8] Because the record reflects that Cannady received two extra strikes in addition to the fifteen he is granted by statute, he did not suffer the loss of two strikes. So for Cannady to demonstrate harm and, therefore, reversible error, he must show that challenges for cause on at least *three* different veniremembers were erroneously denied.[9]

■ In his sixth point of error, Cannady asserts that his challenge for cause against prospective juror Herring should have been granted because Herring stated that Cannady's being in prison would affect his ability to presume Cannady innocent. Article 35.16(a)(10) provides in pertinent part that a challenge for cause may be made by either the State or the defense when:

> there is established in the mind of the juror such a conclusion as to the guilt or innocence of the defendant as would influence him in his action in finding a verdict.

\* \* \*

[I]f the juror states that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence, the court, if satisfied that he is impartial and will render such verdict, may, in its discretion, admit him as competent to serve in such case.

In order for a challenge for cause to be sustained under Article 35.16(a)(10), the challenging party must show that the veniremember has established in his mind a conclusion as to the guilt or innocence of the defendant and that this conclusion will influence his verdict.[10]

■ Herring initially stated that he "can't help but think [Cannady's] guilty if he's already killed two people." But he subsequently said on a number of occasions that he would follow the law. We cannot say the trial judge abused his discretion in denying Cannady's challenge for cause to the veniremember. Point of error six is overruled. Cannady would have this Court review his sixth point under Article 35.16(a)(9), that the veniremember had a bias against the defendant; but given the record, Cannady fails under this provision as well.[11]

■ In his eighth point of error, Cannady asserts that his challenge for cause against prospective juror Christensen should have been granted because Christensen evinced a clear bias against the law of self-defense. Article 35.16(c)(2) provides in pertinent part that a challenge for cause may be made by the defense when:

> he has a bias or prejudice against any of the law applicable to the case upon which the defense is entitled to rely, either as a defense to some phase of the offense for which the defendant is being prosecuted or as a mitigation thereof or of the punishment therefor.

When reviewing a challenge for cause based upon a veniremember's alleged bias against the law, we must determine wheth-

**8.** *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Crim.App.1986), *cert. denied,* 482 U.S. 920, 107 S.Ct. 3197, 96 L.Ed.2d 685 (1987).

**9.** *Penry v. State,* 903 S.W.2d 715, 732 (Tex. Crim.App.), *cert. denied,* 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); *Martinez v. State,* 763 S.W.2d 413, 425 (Tex.Crim.App. 1988), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).

**10.** *Curry v. State,* 910 S.W.2d 490, 493 (Tex. Crim.App.1995).

**11.** *See Hughes v. State,* 878 S.W.2d 142, 152 (Tex.Crim.App.1992); *Kemp v. State,* 846 S.W.2d 289, 299 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993).

er the veniremember's beliefs would prevent or substantially impair him from following the law as set out in the trial court's instructions and as required by the juror's oath.[12] Additionally, we must give great deference to the trial court's ruling on the issue.[13]

The record reveals that Christensen was a correctional officer in a federal prison. Furthermore, he was acting in his official capacity when a prisoner in his unit killed another prisoner. At the trial on that case, the defendant pleaded self-defense. Although he did not see the entire event as it occurred, Christensen was called as a witness and expressed his view to the jury that the defendant had not killed in self-defense. Christensen commented during voir dire that he "was one of the first [persons] at the scene" of the killing in the unit where he was a guard (implying that he did not see the incident from the beginning). But he admitted that he did not hear the other evidence presented at trial. The jury acquitted the inmate of the offense and, although Christensen expressed his dissatisfaction with that outcome, he replied that he had not formed an opinion about Cannady's guilt or innocence. He stated that even as a correctional officer, he would listen to the case and make a determination based solely on the facts and the law.

Given the totality of Christensen's voir dire and the fact that, despite his occasional confusion on an issue, he consistently said that he would listen to the facts and follow the law, we cannot say the trial judge abused his discretion in denying Cannady's challenge for cause. Point of error eight is overruled.

Because we hold the trial court did not abuse its discretion in refusing to strike Herring and Christensen, Cannady cannot show that his challenges for cause to at least three different veniremembers were erroneously denied.[14] Point of error seven (regarding veniremember Rohr) and supplemental point one (regarding veniremember Gomez) are overruled.

## PROPER QUESTION

In his ninth point, Cannady alleges the trial court did not allow him to question veniremember Rohr about her definition of "impartial" when "she worked with law enforcement, knew people in the District Attorney's Office, knew several of the State's witnesses, stated that if she was the defendant she would not want herself on the jury, stated that she was biased for the State, yet insisted she could be fair and impartial."

Asking questions on voir dire helps a party to intelligently exercise his peremptory challenges. Likewise, not being allowed to ask proper questions hampers that exercise. To establish harm from the denial of the intelligent use of a peremptory challenge as to a single veniremember, a defendant must show that he has been deprived of the use of a peremptory challenge he would have used later on.[15] Cannady exhausted all of his peremptory challenges, requested and was denied more, and then identified an objectionable person seated on the jury on whom he would have exercised a peremptory challenge.[16] But because Cannady received two additional peremptory challenges, he cannot show that he has been deprived of the use of the peremptory challenge he used on Rohr (see point of error seven). Point of error nine is overruled.

12. *Lagrone v. State,* 942 S.W.2d 602 (Tex. Crim.App.), *cert. denied,* 522 U.S. 917, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997).

13. *Id.*

14. *Penry, supra.*

15. *Janecka v. State,* 937 S.W.2d 456, 471 (Tex. Crim.App.1996), *cert. denied,* 522 U.S. 825, 118 S.Ct. 86, 139 L.Ed.2d 43 (1997).

16. *Anson v. State,* 959 S.W.2d 203, 204 (Tex. Crim.App.1997), *cert. dism'd,* 525 U.S. 924, 119 S.Ct. 290, 142 L.Ed.2d 241 (1998); *Janecka,* 937 S.W.2d at 470–471 & 471 n. 9.

## STORY FABRICATION/MOTION FOR MISTRIAL

 Cannady complains in his second supplemental point of error that the trial court erred in failing to grant his motion for mistrial when the prosecutor, during his cross-examination of Cannady, accused Cannady and his trial counsel of fabricating a story to create a defense. Cannady recognizes that a defendant who takes the witness stand may be cross-examined and impeached in the same manner as any other witness.[17] Indeed, a defendant may be contradicted, impeached, discredited, attacked, sustained, bolstered, made to give evidence against himself, cross-examined as to new matters, and treated in every respect as any other witness.[18] But he notes that this general rule is qualified by any overriding constitutional or statutory prohibitions.[19] Cannady asserts that the State violated his constitutional right to counsel during the prosecutor's cross-examination of him by (1) accusing Cannady of fabricating his testimony, (2) accusing Cannady of conspiring with his attorneys to create a defense, and (3) accusing Cannady's counsel of suborning perjury.[20]

When Cannady initially took the stand for direct questioning, his counsel asked him about his experiences since going to prison and about the events leading up to the instant offense. Defense counsel established that shortly after the instant offense, Internal Affairs Division investigator William Lazenby came to speak with Cannady about the incident, after which internal prison disciplinary proceedings commenced. Later, defense counsel brought out that Cannady had lied in some of the statements he had made to Lazenby. Cannady also mentioned that he had spoken with an attorney between talking to Lazenby and attending the hearing on his disciplinary proceedings.

 During the State's cross-examination, the prosecutor attacked Cannady's credibility using those lies and the fact that Cannady seemed to have changed his story after talking to an attorney. In his brief, Cannady sets out a fair amount of cross-examination testimony and a number of places where he objected to the State's questions. But his point of error focuses only on the trial court's handling of his motions for mistrial. We shall review only the two instances where Cannady made such requests. The pertinent testimony is as follows:

[BY THE STATE:]

Q. You lied when you talked to Bill Lazenby the first time, didn't you, sir?

A. Yes, sir, I did.

\* \* \*

Q. You also lied when you told Captain Lazenby that you pulled that man off that top bunk and beat him after he crawled up there the first time after you hit him. You lied about that, too, didn't you?

A. Yes, sir.

\* \* \*

Q. I notice also when you were taken out of that cell before you had an opportunity to talk to the lawyers, you weren't crying like a baby when you were walking down that hall, were you? [Cannady apparently cried during his testimony at trial.]

A. No, sir, I was not.

Q. You were acting like you was [sic] as calm as a cucumber, weren't you?

A. No, sir.

Q. You were hollering to your cell mates. What were you telling your cell mates when you were walking down

---

17. *Huffman v. State,* 746 S.W.2d 212, 219 (Tex.Crim.App.1988).

18. *Id.*

19. *Id.*

20. *See Wilson v. State,* 938 S.W.2d 57, 59 (Tex.Crim.App.1996).

those stairs? "I beat him down"? Did you tell them that?

A. No, sir, I did not.

\* \* \*

Q. What defense did you create then with the testimony when—before you had a chance to talk to a lawyer?

A. None, sir.

\* \* \*

Q. And you're telling this jury also that what you said in that statement that's on that television [videotape] before you had a chance to talk to your lawyer is all a lie.

[DEFENSE COUNSEL]: Your Honor, at this moment in time, I make another objection. Any reference to his lawyer. He's attacking the defendant through—

\* \* \*

He's constantly saying, "After you talked to your attorneys, you changed your testimony." We object. He's attacking the defendant over the Defense Lawyer's shoulder, Your Honor.

THE COURT: All right. Rephrase the question. Sustain the objection.

[DEFENSE COUNSEL]: We ask for an instruction to disregard, Your Honor.

THE COURT: The jury's already been told that anytime the Court sustains an objection, they're not to consider it in any respect. Anytime the Court permits or overrules an action, they may consider it and give the proper weight to it. And that will be true at this time.

[DEFENSE COUNSEL]: And we move for a mistrial, Your Honor.

THE COURT: Be overruled.

\* \* \*

\* \* \*

[BY THE STATE:]

Q. Okay. And that's what you told the investigator before you talked to anyone; is that correct?

A. Yes, sir.

\* \* \*

Q. You told the investigator on that videotape that, after you hit the old man, he crawled back upon the bunk and you pulled him off.

A. Yes, sir.

Q. And what you're saying now, that's a lie.

A. Yes, sir.

Q. All right. So you lied about why it started, you lied about what you used, and you lied about what you did in the fight because you were trying to deceive the investigator; is that correct?

A. Yes, sir.

\* \* \*

Q. After you hit him in this situation, you said, "Oh, hold it. I'm sorry, man. Just—all I wanted to do is hit you a couple of times. Now then you understand where we are. Go on back to your bunk and go to sleep."

A. No, sir.

Q. You didn't do that. You didn't understand the law to say that you got to retreat just a little bit, so you're molding your testimony to fit—

[DEFENSE COUNSEL]: I object again.

THE COURT: I sustain the objection.

[DEFENSE COUNSEL]: And I move for a mistrial, Your Honor.

THE COURT: Be overruled. We're asking a lay witness a law question.

For many years this Court has recognized that prosecutors' comments which attack defense counsel are manifestly improper because they serve to inflame the minds of the jury to the accused's preju-

dice.[21] Furthermore, we have often held that the prejudice created by such comments is not curable by an instruction to disregard.[22] But the two instances above do not fall into this prejudicial category.

In the first instance, the prosecutor got Cannady to admit that what he said before speaking to an attorney was a lie. If anything, this implies that meeting with his attorney caused Cannady to tell the truth. This is quite the opposite of a claim that Cannady's attorney allowed or even encouraged Cannady to lie.

In the second instance, the prosecutor's accusation that Cannady was molding his testimony to fit what he understood the law to be was an accusation pointed directly at Cannady. There was no implication that Cannady's counsel was involved at all. Cannady's second supplemental point of error is overruled.

In his related third supplemental point, Cannady claims that the trial court erred in failing to grant his motion for mistrial when the prosecutor accused Cannady and his trial counsel during final argument on guilt/innocence of fabricating a story to create a defense. Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement.[23] During Cannady's closing argument, each of the three defense counsel painted a picture for the jury of Cannady as a weak person; of a young, inexperienced inmate who knew from recent events that he was going to be brutally victimized if he did not defend himself soon. Cannady complains of the following emphasized comments:

[BY THE STATE:]

 Ladies and gentlemen of the jury, this [charge] was generated by [Cannady], and you as a jury have a right to consider the fact that he's been convicted for two murders, that he's been convicted of robbery, and use that as part of whether or not you believe this man could, under any stretch of anybody's imagination, tell you the truth. He doesn't have that ability. He don't [sic] even know what the truth was. If it stood up today and hit him in the face he wouldn't recognize it. That's where he stands at this time, and he tells you he is weak. His lawyer tells you he's weak. His lawyer would have you believe that he's weak. But is he?

 *The testimony that he give [sic] you from that witness stand tells you that he is a predator, that he stalks his prey. And I find it absolutely impossible to understand how any lawyer could stand up—*

[DEFENSE COUNSEL]: Your Honor, I object at this moment in time, he's attacking the Defendant over the shoulder of the defense attorney, Your Honor.

THE COURT: All right. Rephrase.

[BY THE STATE:]

How anything or anybody could stand up and tell a jury—

[DEFENSE COUNSEL]: Your Honor, again, we renew the same objection, Your Honor, he's attacking the Defendant over the shoulder—

THE COURT: Your argument is he's attacking [the] Defendant over counsel's shoulder?

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: I'll sustain the objection.

[DEFENSE COUNSEL]: We ask for a mistrial, Your Honor.

THE COURT: Be overruled.

[Emphasis added.] The complained-of comment appears to have been intended as a response to the argument of defense counsel, which would be proper jury argument. Because Cannady's objection cut

---

21. *See Wilson,* 938 S.W.2d at 59.

22. *Id.*

23. *See, e.g., Wilson,* 938 S.W.2d at 59.

the statement short, we cannot be clear about the prosecutor's intention. Notwithstanding this, we hold that the trial judge's sustaining of Cannady's objection, and his previous instruction to the jury to disregard any statement on which he sustained an objection, cured any harm which occurred here.[24] Supplemental point of error three is overruled.

## CONSTITUTIONALITY OF DEATH PENALTY SCHEME

In his fourth supplemental point of error, Cannady asserts that his death sentence violates the Eighth and Fourteenth amendments to the United States Constitution and Article I, § 13, of the Texas Constitution. Cannady gives only a general argument supporting his contention citing, among other things, Justice Blackmun's dissent in *Callins v. Collins.*[25] We have previously addressed this issue and held against Cannady's position.[26] Cannady has not persuaded us to revisit these decisions. Supplemental point of error four is overruled.

Cannady asserts in his seventh and ninth supplemental points of error that his death sentence constitutes cruel and unusual punishment under both the federal and state constitutions. In his argument regarding the Texas Constitution, Cannady asserts that the state provision should be interpreted more broadly than its federal counterpart because it prohibits "cruel or unusual punishment." Without more, Cannady has failed to adequately brief his point of error.[27] Cannady also asserts that

the narrowing function of Texas Penal Code § 19.03(a)(6) is not facially constitutional because the length of the sentence a person is serving does not provide a reasoned, principled basis for distinguishing between death eligibility and ineligibility. Cannady raised the same claim in his pretrial appeal, but the court did not answer the issue because Cannady did not show that the statute was unconstitutional as to him.[28]

To pass muster under the Eighth Amendment, an aggravating circumstance contained in an element of a capital offense must meet two requirements: first, the circumstance may not apply to every defendant convicted of a murder, it must apply only to a subclass of defendants convicted of murder; and second, the aggravating circumstance must not be unconstitutionally vague.[29] Texas Penal Code § 19.03(a)(6) meets both of these requirements: inmates who murder another in prison while serving a sentence of life imprisonment or a term of 99 years for the commission of an offense listed in Article 42.12 § 3g(a)(1) make up a subclass of murderers in general; and persons "serving a sentence of life imprisonment or a term of 99 years for the commission of any offense listed in Section 3g(a)(1), Article 42.12" make up a clear and definite category. Supplemental points of error seven and nine are overruled.

Cannady asserts in his eighth and tenth supplemental points of error that his death sentence violates the Equal Protec-

24. *See, e.g., Ransom v. State*, 920 S.W.2d 288, 303 (Tex.Crim.App.1994), *cert. denied*, 519 U.S. 1030, 117 S.Ct. 587, 136 L.Ed.2d 516 (1996).

25. 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994).

26. *See, e.g., Raby v. State*, 970 S.W.2d 1, 7 (Tex.Crim.App.), *cert. denied*, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998); *Lawton v. State*, 913 S.W.2d 542, 558 (Tex.Crim. App.1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996).

27. *See* Tex.R.App. P. 38.1(h); *Henderson v. State*, 962 S.W.2d 544, 572 (Tex.Crim.App. 1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998); *Sonnier v. State*, 913 S.W.2d 511, 520 (Tex.Crim.App.1995).

28. *See State v. Cannady*, 913 S.W.2d at 744–745.

29. *Tuilaepa v. California*, 512 U.S. 967, 971–972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Henderson v. State*, 962 S.W.2d 544, 563 (Tex. Crim.App.1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998).

tion requirements of both the federal and state constitutions. In his argument regarding the Texas Constitution, Cannady recognizes that this Court in the past has held that the Texas equal rights provision and the federal equal protection provision are coterminous.[30] But he urges us to reconsider these holdings. This we will not do. Cannady contends that there is no constitutionally permissible distinction for the purpose of a capital conviction under Texas Penal Code § 19.03(a)(6) between an inmate serving a life sentence and one serving, *e.g.*, a 60–year sentence. In reviewing a statute for an equal protection violation, we must first determine the level of scrutiny required. A statute is evaluated under "strict scrutiny" if it interferes with a "fundamental right" or discriminates against a "suspect class."[31] Otherwise, the challenged classification in a statute need only be "rationally related to a legitimate governmental purpose" to survive the equal protection challenge (the "rational basis" test).[32]

■ In reviewing the constitutionality of Texas Penal Code § 19.03(a)(8) in *Henderson,* we determined that capital murder defendants do not constitute a "suspect class."[33] Furthermore, the life of a convicted capital murderer is no longer held sacrosanct and "life" no longer enjoys the status of a fundamental right.[34] Therefore, a claim that a provision of the capital murder statute violates equal protection is reviewed using the rational basis test and the challenged classification need only be "rationally related to a legitimate governmental purpose."[35]

■ We have recognized that states have a legitimate and compelling interest in maintaining the safe, orderly, and effective functioning of prisons.[36] The question is whether a particular statute, in this case Texas Penal Code § 19.03(a)(6), is rationally related to serving the government's interest in maintaining that safety and order. In making this determination, we first note that inmates who have committed murder or other aggravated offenses have already shown a certain propensity for violence.[37] Furthermore, the greater the sentence that the inmate received, the less he may have to lose by committing further offenses in prison. So demarcating a sub-class of "aggravated offense inmates" within the category of "inmates" as a whole and flagging them for special treatment is a rational action supporting the maintenance of safe and orderly prisons.

But Cannady argues that drawing a line between inmates sentenced to "life" versus those sentenced to some other term, *e.g.*, 60 years is arbitrary and, therefore, unconstitutional. Likewise, he argues a line drawn between a 99–year sentence and a 98–year sentence is arbitrary. But, as in *Henderson* with the child-murderer provision, to retain clarity in the statute, a numerical line must be drawn somewhere.[38] Using the maximum sentences already used throughout the Texas Penal Code provides consistency and clarity.

The Legislature is justified in drawing a line between harsher and lesser punishments and using the maximum sentences allowed seems to be as good a place as any

30. *See, e.g., Henderson,* 962 S.W.2d at 560.

31. *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 458, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *Henderson,* 962 S.W.2d at 560.

32. *Henderson,* 962 S.W.2d at 560.

33. *Id.*

34. *Id.*

35. *Id.*

36. *See Ex parte Hernandez,* 953 S.W.2d 275, 281 (Tex.Crim.App.1997), *cert. denied,* 522 U.S. 1135, 118 S.Ct. 1093, 140 L.Ed.2d 149 (1998); *Basden v. State,* 897 S.W.2d 319, 321 (Tex.Crim.App.1995); *Richardson v. State,* 865 S.W.2d 944, 956 (Tex.Crim.App.1993).

37. *See* Article 42.12 § 3g(a)(1).

38. *See Henderson,* 962 S.W.2d at 562–563.

to draw that line.[39] Of course, different factors influence different judges and juries into giving various sentences, but we need not and will not resort to such environment-specific justifications to uphold the Legislature's line-drawing choice.[40] That the line might have been legitimately drawn at 59-, 60-, or 98–years does not invalidate the Legislature's choice here. We uphold the Legislature's decision to draw the line at a sentence of life or 99 years. Supplemental points of error eight and ten are overruled.

## ADDITIONAL POINTS OF ERROR

██ Cannady argues in his fifth supplemental point that he should have been allowed to have the jury decide his guilt or innocence on the homicide before it received evidence of his prior convictions. Cannady asserts that extreme prejudice is built into Texas Penal Code § 19.03(a)(6) in that it allows evidence of his prior convictions to be admitted during the guilt/innocence phase of trial which, in turn, invites the jury to convict him as a criminal generally and not on the facts of this particular incident.[41]

In his argument, Cannady cites Article 36.01(a)(1) which states in pertinent part that "[w]hen prior convictions are alleged for purposes of enhancement only and are not jurisdictional, that portion of the indictment or information reciting such convictions shall not be read until the hearing on punishment is held." This section contemplates that prior convictions are not to be admitted until the punishment phase, whereas Cannady's motion and his point of error, which both assert that he should have been allowed to "bifurcate the guilt/innocence phase," seem to suggest that the guilt/innocence phase actually be split into two stages.

Notwithstanding the lack of clarity, Cannady's point must fail. Under Section 19.03(a)(6), the status of Cannady as an inmate serving a particular sentence (life or 99 years) is an element of the crime of capital murder.[42] Indeed, it is the aggravating element that raises the crime from simple murder (a first-degree felony) to a capital offense. Although the details of the prior conviction may be more prejudicial than is warranted for admission at guilt/innocence, a point which Cannady does not argue here, the State is entitled to prove the fact of the commission of a crime listed in Article 42.12 § 3g(a)(1) and the sentence imposed as part of its burden to prove the crime of capital murder. This requisite does not violate either the due process or due course of law protections.[43] The trial court did not err in overruling Cannady's motion to "bifurcate the guilt/innocence phase of trial." Supplemental point of error five is overruled.

In his sixth supplemental point of error, Cannady asks, "Does Article 42.08(b) require Cannady's death sentence to be cumulated with, or stacked on, the sentence he was serving at the time of the offense?" Article 42.08(b) states as follows:

> If a defendant is sentenced for an offense committed while the defendant was an inmate in the institutional division of the Texas Department of Criminal Justice and the defendant has not completed the sentence he was serving at the time of the offense, the judge shall order the sentence for the subsequent offense to commence immediately on completion of the sentence for the original offense.

Cannady contends that the plain language of the statute requires his sentence of death to be stacked onto the two life sentences he is already serving. He asserts that, because his two life sentences were

---

**39.** *See id.*

**40.** *See id.*

**41.** *See* Tex.R.Crim. Evid. 404(b).

**42.** *See State v. Mason,* 980 S.W.2d 635, 640 (Tex.Crim.App.1998).

**43.** *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

ordered to run consecutively, his death sentence cannot be carried out until his second life sentence ceases to operate.[44]

 When analyzing the meaning of a statute, we begin with the literal text of the statutory provision at issue.[45] We must attempt to discern the legislative intent or purpose of the statute by, if reasonably possible, giving effect to the plain meaning of the statute's language.[46] But where application of the plain meaning of the statute's language would lead to absurd consequences that the Legislature could not possibly have intended, this Court, in arriving at a sensible interpretation of the legislative intent of the statute, will consider such extratextual factors as the legislative history and the objective sought by the statute.[47]

 In *Basden,* the defendant had been assessed three sentences: 50 years for an aggravated robbery, 15 years for an attempted capital murder, and 50 years for an aggravated assault—both of the latter offenses were committed while Basden was in prison. Basden contended that, under the statute, his 15–year and his second 50–year sentence should run consecutive to the first 50–year sentence, while running concurrently to each other. The lower court, on the other hand, determined that the 50–year sentence for assault would run consecutively to the 15–year attempted capital murder sentence, which was scheduled to run consecutively to the original 50–year sentence for aggravated robbery.

We noted that the obvious intent of Article 42.08(b) is to deter inmates from committing crimes during their incarceration and to more harshly punish those inmates who are not deterred.[48] We held that giving effect to the plain meaning of Article 42.08(b) as Basden suggested would lead to the absurd result of permitting inmates to commit crimes without fear of punishment since, although the first sentence assessed for a crime committed in prison would run consecutively to the original sentence, all future sentences assessed would run concurrently with the latter. So a disruptive inmate might be punished for one offense committed in prison, but would ever after be immunized from further prosecution and punishment. Because of this absurd result, we determined that the Legislature could not have intended such a consequence and we refused to adopt such an interpretation.[49]

In conducting our analysis in *Basden,* we also determined that the legislative history of Article 42.08(b) supported our holding. Subsection (b) of Article 42.08 was added by the 69th Legislature and became effective September 1, 1985.[50] The bill analysis prepared for SB 186 specifically stated that the bill was written to address the issue of deterring inmates from continued criminal behavior beyond the loss of good time by making them serve consecutive sentences instead of concurrent ones. Furthermore, at the public hearing held before the House Committee on Law Enforcement on March 20, 1985, the testimony presented made clear that the purpose of SB 186 was to prevent violence in the Texas Department of Criminal Justice (then the Texas Department of Corrections) by mandating consecutive sentences. The clear message was that the Legislature intended no concurrent sentences for crimes committed by inmates.[51]

44. *See* Article 42.18 § 8(d)(2); now codified as Gov't Code § 508.150.

45. *Boykin v. State,* 818 S.W.2d 782 (Tex.Crim. App.1991).

46. *Boykin,* 818 S.W.2d at 785–86; *see also Basden,* 897 S.W.2d at 321.

47. *See Boykin,* 818 S.W.2d at 785–86; *see also Basden,* 897 S.W.2d at 321.

48. *Basden,* 897 S.W.2d at 321–322.

49. *Basden,* 897 S.W.2d at 322.

50. *See* Acts, 69th Leg., Reg. Session 1985, Ch. 29, p. 404 (SB 186).

51. *Basden,* 897 S.W.2d at 321–322.

But our interpretation in *Basden* does not apply when a defendant has been sentenced to death for a crime committed while in prison. While we held that the legislative intent of Article 42.08 was clearly to deter inmates from continued criminal behavior, it is equally clear that the Legislature did not contemplate the sentence of death when considering concurrent versus consecutive sentencing. This conclusion is clear for several reasons. First, delaying a death sentence until other sentences are served would place the defendant in the exact position the Legislature intended him not to be: the position of being able to commit further crimes without fear of punishment—for how can he be punished after he is dead (since any subsequent sentence assessed would have to be stacked onto his death sentence pursuant to *Basden* and Article 42.08(b)). Indeed, it would give him an unlimited license to kill.

Another indication that the Legislature did not contemplate the imposition of the death penalty when drafting Article 42.08(b) is found in the very language used. For a sentence to "commence" or to be "completed" implies that it has a beginning and an end. A death sentence occurs in an instant—its beginning and end merged into a single act. The language of Article 42.08, on the other hand, reflects a service of a period of time over days, years, or decades. Although a defendant can be under a sentence of death for a period of time, the actual service of that sentence occurs only in a brief moment.

Because of the plain language of Article 42.08, the legislative intent underlying the statute, and the legislative intent underlying the death penalty scheme, we must conclude that the Legislature did not intend Article 42.08 to apply to a death sentence. We hold that the sentence of death may be executed without regard to other sentences Cannady might have pending.[52]

52. *See* Art. 43.14, *et seq.*

Finding no reversible error, we affirm the judgment of the trial court.