**Opinion filed March 31, 2015**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00335-CR

_____

## ALFRED JAMES WILLIAMS, Appellant
## V.
## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 10254-D**

### M E M O R A N D U M   O P I N I O N

The jury convicted Appellant, Alfred James Williams, of murder. Appellant pleaded "true" to an enhancement paragraph for one prior felony conviction. The jury assessed punishment at confinement for twenty-five years, and the trial court sentenced Appellant accordingly. On appeal, Appellant asserts that the trial court erred when it (1) denied his motion for a mistrial, (2) included a limitation in the

jury instruction on self-defense, and (3) overruled his alleged *Brady*[1] claims. We affirm.

## I. *Evidence at Trial*

Appellant, Floyd Patterson (Flo), and Demarques Donte Taylor (D-Train) got into an argument one night. Appellant also got into an argument with Kerion Harness that night. All were at the Little Elm Apartments in Abilene. Their disagreements spilled over into the next day when Appellant and Kerion met in the parking lot at Little Elm Apartments. The argument ended there in that parking lot when Appellant shot and killed Kerion.

Prior to the shooting, D-Train and Appellant had decided to go to Dallas; they had parked D-Train's car next to a dumpster in the parking lot at the Little Elm Apartments to clean out the car. Jackie Lenius said that she, Kerion, and their children went to a friend's apartment at the complex and that Kerion went inside to get marihuana. As they were leaving the complex's parking lot, Kerion saw D-Train and Appellant, and he stopped his car to talk to them. D-Train heard Kerion say, "I heard you n-----s . . . came by . . . the Scroggins' house . . . looking for me." D-Train responded that he was not looking for Kerion. Kerion then said to Appellant, "I know you but you don't know me," and "I know you, n----r. You don't even know me."[2] Flo then walked up and got into an argument with Appellant over money. Appellant then walked upstairs to D-Train's apartment; Flo saw Appellant leave and return.

Surveillance equipment[3] recorded Appellant when he walked up to D-Train's apartment and returned downstairs with a handgun in his hand; he also had put on a hoodie. Flo and Appellant exchanged words about whether Appellant

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] This was apparently a reference to a prior drug deal between Appellant and Kerion.

[3] George Gonzales placed video surveillance equipment in his apartment window so he could monitor his vehicle, which had been vandalized, and he maintained a log of his recordings. Gonzales said he saw Appellant in the video come out with a gun in his hand.

2

would shoot Flo. Appellant remarked, "You right, you d--n right . . . I got mine" as he displayed his handgun. Flo claimed to hear Appellant "cock" his handgun. Kerion and Appellant argued, and Kerion said, "I heard ya'll was looking for me." Kerion also said, "I'm from Louisiana; we don't fight, we shoot." Appellant lifted his shirt and said, "you wanna shoot?" and he pulled his gun from his waistband; Lenius asked, "[A]re you gonna shoot in front of my kids?" Appellant responded, "[H]--l yeah."

Easter Marshall said that Appellant had a gun and that she saw him put a clip in it during the argument. She said Flo, D-Train, Appellant, and Kerion were talking when Kerion leaned down near the driver's side door, which was open. D-Train said that Kerion said, "F--k that" and turned and walked toward his car. D-Train said that Lenius said, "Let's go; f--k that s--t; don't get that"; "[d]on't get that; let's go," as Kerion approached his car. Lenius denied that Kerion said anything. According to Lenius, Kerion turned and reached for the car door, which had to be opened from the inside. As Kerion reached to open the door, Appellant shot him twice. Kerion stumbled around his car and collapsed in the front passenger seat.

Neither D-Train nor Flo saw Kerion with a gun. Lenius denied that Kerion threatened anyone and denied that he had a gun in the car. Lenius and Marshall corroborated Flo's and D-Train's testimony that Appellant shot Kerion. After the shooting, Appellant said to D-Train, "Let's go, I just shot this n----r." Appellant ran off, but D-Train did not go with him. D-Train drove to his grandmother's house where he was later arrested by police. Aleshia Barnes testified that Appellant ran into her house, and asked to use the phone. Appellant told Barnes that he had just "shot somebody," and Appellant had a handgun in his jacket. Barnes gave him the phone; he called someone and eventually left.

Jamie McQueen testified that her cousin, Kathy Taylor, is married to D-Train and that McQueen was at the Little Elm Apartments when shots were fired; she and Taylor and their kids got into Kathy's car and left. Once stopped in

traffic, they picked up Appellant and then drove him to another apartment complex. While in the car, Appellant said he had just shot someone. Once at the apartment, Appellant got a ride to Dallas from Veronica Hardeman;[4] he gave the gun to McQueen and Taylor, who threw it into a creek bed. They later directed police to the location of the gun.

Ernest Moscarelli, a detective with the Abilene Police Department, responded to the scene. He spoke to Lenius, interviewed Flo and D-Train, and later interviewed Taylor and McQueen. He also interviewed Hardeman twice, once in his office and once in the video room. Lynn Beard, a Sergeant with the Abilene Police Department, responded to the scene and helped interview people and searched the complex. Sergeant Tony Lassetter, a police officer with the Abilene Police Department interviewed Lenius at the scene. Detective Moscarelli interviewed Hardeman, who he suspected was untruthful in her interview. He also viewed the surveillance videotape and confirmed recovery of the gun from the creek bed.

Stephanie Hughes and Wallace McDaniel—the former, a forensic specialist, and the latter, a criminalist officer—collected evidence at the scene, which included shell casings, and recovered the gun from the creek bed. Amanda Flory, a forensic specialist with Alliance Forensics Laboratory in Fort Worth, tested the recovered handgun and the shell casings and found that they matched. Nizam Peerwani, the medical examiner, conducted an examination and autopsy of Kerion; he found no defensive wounds, but he found two gunshot wounds, one in the back and the second in the right arm. The gunshot to the back killed Kerion.

Appellant testified in his own defense and asserted that he shot Kerion because he thought Kerion was going for a gun in his car. Appellant denied he knew Kerion; testified that Kerion had threatened him the night before the shooting

---

[4]Veronica Hardeman, who was friends with Appellant, picked him up at the Pebble Creek Apartments and took him to Dallas after the shooting. Appellant told her he shot Kerion because he thought Kerion was going for a gun, but Appellant told her he never saw a gun.

and the day of the shooting; and explained that, when Kerion turned to go to his car and reached inside the window of the driver's door, Appellant shot him.

## II. *Analysis*

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). We must first determine whether error occurred. If so, we must then evaluate whether the error requires reversal. *Id.* at 731–32. To establish reversible error under *Brady*, a defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). We will address each of Appellant's issues sequentially.

### A. *Issue One: Mistrial*

Appellant argues that the trial court erred when it denied his motions for mistrial following comments made by the prosecutor in closing argument that Appellant was a "murderer" and wanted the jury to "devalue life." We apply an abuse of discretion standard during review, and we will uphold the denial of a motion for mistrial if it is within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77.

The law provides for, and presumes, a fair trial free from improper argument by the prosecuting attorney. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the

5

argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Even when an argument exceeds the permissible bounds of these approved areas, it is not reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive Appellant of a fair and impartial trial. *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)).

Instructions to the jury will generally cure most improprieties that occur during trial, and we presume that a jury will follow the judge's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). A mistrial is an appropriate remedy only in extreme circumstances and is reserved for a narrow class of highly prejudicial and incurable errors. *Hawkins*, 135 S.W.3d at 77. If the harm caused by an improper jury argument is incurable, a motion for mistrial preserves error for appellate review. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). In determining whether improper jury argument warrants a mistrial, the *Mosley* court balanced three factors: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

The prosecutor asserted that Appellant wanted the jury to "devalue life" and also called him a "murderer" on three separate occasions. None of these comments were proper jury argument. *See Brown*, 270 S.W.3d at 570; C*annady*, 11 S.W.3d at 213. Defense counsel objected the first time when the prosecutor said that Appellant wanted the jury to "devalue life"; the trial court sustained the objection

and provided an instruction to disregard. Appellant moved for mistrial, which was denied. When the prosecutor again gave an improper jury argument by calling Appellant a "murderer," defense counsel objected, and the court again instructed the jury to disregard and told the jury to decide the case on the evidence. Appellant again moved for a mistrial, which was denied. The third time the prosecutor gave an improper jury argument was when he called Appellant a "murderer" twice in short succession; the trial court instructed the prosecutor to "restrict the characterizations." Appellant moved for mistrial a third time, and the trial court denied the motion.

Under the first *Mosley* factor, we conclude that the prosecutor's comments were both improper and prejudicial. *See Mosley*, 983 S.W.2d at 258–60. Under the second *Mosley* factor, the trial court properly instructed the jury twice to disregard the prosecutor's comments. *Id.* at 259–60. After the second objection, the trial court essentially instructed the jury it was the jury's decision to resolve facts and determine if Appellant was guilty of the offense charged. All of these instructions cured the errors by the prosecutor, which although improper and prejudicial, were isolated and occurred in short succession. *Id.*; *see Gamboa*, 296 S.W.3d at 580.

Under the final *Mosley* factor, we observe that the prosecutor did not inject new or harmful facts into the trial and did not violate a mandatory statute. *See Mosley*, 983 S.W.2d at 258–60. His comments were made in connection with his summation of evidence at the end of his argument, in which he argued that Appellant had committed murder beyond a reasonable doubt when he shot Kerion in the back without justification. Given the evidence the State amassed against Appellant and Appellant's own testimony, we hold that the trial court did not abuse its discretion when it denied Appellant's motions for mistrial. Even if it did, any error was harmless because it was not incurable, did not affect Appellant's substantial rights, and did not deprive him of a fair trial. *Id.*; *see* TEX. R. APP. P. 44.2(b); *Hawkins*, 135 S.W.3d at 77. We overrule Appellant's first issue.

7

*B. Issue Two: Alleged Jury Charge Error*

Appellant asserts that the trial court erred when it included an instruction in the jury charge[5] that limited Appellant's right to self-defense under Section 9.31(b)(5)(A) of the penal code. TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (West 2011). Self-defense is a justification for conduct that would otherwise be criminal. *See id.* §§ 9.02, 9.31. "[A] person is justified in using force against another when and to the degree [he] reasonably believes the force is immediately necessary to protect [himself] against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). But "[t]he use of force against another is not justified . . . if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was" unlawfully carrying a weapon under Section 46.02. *Id.* § 9.31(b)(5)(A). "A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun . . . if the person is not: (1) on the person's own premises or premises under the person's control." *Id.* § 46.02(a)(1) (West Supp. 2014).

A charge limiting a defendant's right of self-defense is properly given when (1) self-defense is an issue, (2) there are facts in evidence that show the defendant sought an explanation from or discussion with the victim concerning their differences, and (3) the defendant was unlawfully carrying a weapon. *Id.* § 9.31(b)(5)(A); *Davis v. State*, No. 05-10-00732-CR, 2011 WL 3528256, at *10 (Tex. App.—Dallas Aug. 12, 2011, pet. ref'd) (not designated for publication); *Lee v. State*, 259 S.W.3d 785, 789 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). To determine whether the limitation was warranted, we view the evidence in the light most favorable to giving the instruction. *See Fink v. State*, 97 S.W.3d 739, 743 (Tex. App.—Austin 2003, pet. ref'd). If there is any evidence raising a

---

[5]The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). A trial court must instruct the jury on statutory defenses, affirmative defenses, and justifications when raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007).

fact issue on the limitation, an instruction should be submitted. *Bumguardner v. State*, 963 S.W.2d 171, 175–76 (Tex. App.—Waco 1998, pet. ref'd).

When we review a claim of jury charge error, we engage in a two-step process. First, we determine whether error exists, and then we determine whether sufficient harm resulted from the error to require reversal. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Olivas v. State*, 202 S.W.3d 137, 143 (Tex. Crim. App. 2006); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). We do not reach the harm issue, however, unless we first find error in the charge. *See Barrios*, 283 S.W.3d at 350. If the error in the charge was the subject of a timely objection, reversal is required if there is some harm to the defendant because of the error. CRIM. PROC. art. 36.19 (West 2006); *Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000); *Almanza*, 686 S.W.2d at 171. Appellant objected to the inclusion of the instruction and preserved error.

Appellant was unlawfully carrying a gun when he shot Kerion, but he argues the limiting instruction was improper because he did not seek a discussion with Kerion over differences. In *Hernandez*, the court held that a trial court did not err when it submitted the instruction because Hernandez and another person, Omar, had a disagreement over who had some guns that belonged to Gilberto. *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Hernandez claimed that, although Gilberto asked him to speak to Omar, the differences were between Omar and Gilberto and that, therefore, the limiting instruction was improper. *Id.* at 64–65. The appellate court rejected that assertion and held that a discussion between Appellant and Omar satisfied the statute and that the trial court properly submitted the instruction. *Id.* at 665–66. The day before the shooting, Kerion and Appellant argued and threatened each other. The next day, while Appellant and D-Train emptied D-Train's car of trash, Kerion parked his car nearby and approached them; a short time later, Appellant went into D-Train's apartment, got a gun, and returned. Kerion asked D-Train and

Appellant if they were looking for him; D-Train said no, and Appellant argued with Kerion. Kerion said, "F--k that" and started to walk toward his car. Appellant shot Kerion in the back as Kerion leaned into his car. The trial court did not err when it submitted the instruction. *See Hernandez*, 309 S.W.3d at 665.

Even if we were to hold that the trial court erred in giving the limiting instruction, which we do not, the result would be no different. *See Ovalle*, 13 S.W.3d at 786; *Almanza*, 686 S.W.2d at 171. In evaluating whether there was some harm from jury charge error, we should consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171). Appellant shot Kerion following an argument. The medical examiner testified that Kerion died from a gunshot wound. The police found shell casings at the scene and recovered Appellant's gun; ballistics testing matched them to each other. No one, not even Appellant, testified that Kerion had a gun when he was shot. After a review of the evidence, the jury charge, the contested issues, and the arguments of counsel, we note that the evidence was disputed but that, even if the instruction was in error and should not have been part of the jury charge, there was no harm. We overrule Appellant's second issue.

C. *Issue Three: Alleged Brady Violation*

Appellant asserts that a *Brady* violation occurred when the State did not disclose that a witness, Veronica Hardeman—who had been told by Appellant that he saw someone get in the victim's car, get a gun, and hide the gun in the bushes—had given that information to law enforcement. Appellant also argues that a second *Brady* violation occurred when the State failed to disclose that Sergeant Beard had heard rumors about a gun in the victim's car that had been taken and hidden at the apartment complex. Both violations, Appellant claims, prejudiced him because the State suppressed material evidence that was favorable to him.

10

The State has an affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment. *Brady*, 373 U.S. at 86. *Brady* requirements extend to both impeachment and exculpatory evidence, and no request is required by the defendant. *United States v. Bagley*, 473 U.S. 667 at 676–77 (1985); *United States v. Agurs*, 427 U.S. 97, 111–12 (1976); *Harm v. State*, 183 S.W.3d 403, 409 (Tex. Crim. App. 2006). Prosecutors have a duty to learn of *Brady* evidence known to others acting on the State's behalf in a particular case. *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995). The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when requested. *Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992).

As an initial procedural matter, when a defendant asserts during trial that a *Brady* violation has occurred, he is entitled to a recess of the trial to obtain production of the material. *Crawford v. State*, 892 S.W.2d 1, 4 (Tex. Crim. App. 1994). A defendant must request a continuance or a recess to protect due process; otherwise, the complaint about the State's failure to disclose information is waived. *Payne v. State*, 516 S.W.2d 675, 677 (Tex. Crim. App. 1974); *State v. Fury*, 186 S.W.3d 67, 74 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). A defendant's failure to request a continuance indicates the tardy disclosure was not prejudicial. *Fury*, 186 S.W.3d at 73–74. In this case, the trial court held a *Brady* hearing, and defense counsel questioned two police officers but never requested a continuance or a recess. Appellant has waived error. *Payne*, 516 S.W.2d at 677; *Fury*, 186 S.W.3d at 74.

But even if we are incorrect, and Appellant had preserved error, his *Brady* claims still fail. First, the information that Hardeman testified about came from Appellant. Appellant told her that he shot Kerion because he thought Kerion was going for a gun but that he never saw a gun. Hardeman did not cooperate with police and did not initially tell them that Appellant told her someone had taken a gun from Kerion's car and hidden it in the bushes; this occurred in a later interview. The State does not have a duty to disclose evidence, if the defendant

11

actually knew of the exculpatory evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810. If Appellant failed to investigate information he knew or should have known, then there is no *Brady* violation. *Dalbosco v. State*, 978 S.W.2d 236, 238 (Tex. App.—Texarkana 1998, pet. ref'd).

Second, Appellant claimed he was unaware of the rumors Sergeant Beard had heard and claimed his trial would have been different had this information been disclosed. To show a *Brady* violation, Appellant must establish that the State suppressed material evidence favorable to him. *Harm*, 183 S.W.3d at 406 (citing *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *Thomas*, 841 S.W.2d at 402–03). The materiality of the undisclosed information is not sufficiently proven by showing a mere possibility that the undisclosed information might have helped in the defense or might have affected the outcome of the trial. *Hampton*, 86 S.W.3d at 612. When evaluating whether the materiality standard is satisfied, we balance the strength of undisclosed evidence against evidence supporting the conviction. *Id.* at 613. When such evidence is disclosed during trial, the issue is whether the defendant was prejudiced by the late disclosure. *Little*, 991 S.W.2d at 867. But the question is not whether the defendant would more likely than not have received a different verdict with the undisclosed evidence, but whether, in its absence, he received a fair trial—understood as a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434; *Pena*, 353 S.W.3d at 812 n.11. We analyze the alleged *Brady* violation in light of all the other evidence adduced at trial. *Hampton*, 86 S.W.3d at 612–13.

After the shooting, Officer Wilson spoke to Hardeman, who mentioned nothing about a gun in the bushes at the Little Elm Apartments. Later, Detective Moscarelli interviewed Hardeman twice; his notes about the second interview reflected that she claimed Appellant had told her someone had taken a gun from Kerion's car and hidden it in the bushes at the apartment complex. Detective Moscarelli questioned the validity of Hardeman's statements because she had initially denied any involvement, she was evasive and uncooperative, her

comments about the gun in the bushes were not specific, and she said she got the information from Appellant.

Detective Moscarelli ordered a search of the apartment complex, but a gun was never recovered there. John Clark, a detective with the Abilene Police Department, testified that he and several other officers were sent to the apartment complex after the shooting to look for a gun on the property. Officer Beard told him where to search, but no gun was recovered there. Austen Walker, a detective with the Abilene Police Department, searched the entire complex for evidence but did not find a gun there. Sergeant Beard said that, although he had heard a rumor about a gun on the property, he could get no names of people to interview about the rumor. The police did not follow up on the rumor because no witness had described the victim as having a gun at the time of the shooting.

Appellant shot and killed Kerion. He did so after he got a gun from D-Train's apartment and came back to D-Train's car to continue his argument with Kerion—an argument that ended in Kerion's murder. Appellant's gun was recovered; the shell casings matched it. No one testified that Kerion had a gun in his hand when he was shot, and his girlfriend testified there was no gun in the car. The police found no gun at the apartment complex and no witness who would corroborate the rumor, which originated with Appellant. Appellant claimed self-defense and received a self-defense instruction, but the jury decided that issue against him. Appellant has not explained how an earlier disclosure of the complained-of information prejudiced him or would have made any difference at trial. We have reviewed the evidence for and against the conviction and the evidence that Appellant claims was a *Brady* violation, and we hold there was no violation. But even if we are incorrect, Appellant was not prejudiced by the tardy disclosure. We overrule Appellant's final issue.

13

### III. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

March 31, 2015

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.