TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-99-00412-CV






In the Matter of L. J. G.









FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT


NO. J-18,541, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING







 The district court, sitting as juvenile court, found that juvenile appellant L.J.G.
engaged in delinquent conduct by committing the offense of aggravated assault and two counts of
the offense of terroristic threat. See Tex. Penal Code Ann. §§ 22.02, .07 (West 1994); Tex. Fam.
Code Ann. § 51.03 (West Supp. 2000). In four issues, L.J.G. appeals. We will affirm.


BACKGROUND


 On or about October 15, 1998, appellant L.J.G. was ten years old and in the fifth
grade at an Austin elementary school. At the beginning of the school day, appellant asked a male
classmate, B.C., if he wanted to join a club and kill people. B.C. asked appellant why he was
asking and if he had a gun. Appellant replied affirmatively, unzipped his backpack, and showed
B.C. a gun inside.

 Appellant and B.C. sat in a square, four-desk arrangement with two female
classmates, S.F. and K.C. The girls heard the boys talking, and B.C. asked appellant if he could
tell the girls what they were talking about. Appellant agreed, and B.C. told the girls that appellant
had a gun. One girl asked appellant why he had a gun. S.F. and B.C. testified that appellant said
he was going to take the class hostage. B.C. and K.C. testified that appellant said he would shoot
anyone who tried to stop him.

 B.C. told appellant that he was going to tell the teacher. Appellant warned B.C.
that if he did so, appellant would shoot him. At some point, B.C. got up to go tell the teacher. 
B.C. testified that appellant then began to remove the gun from the backpack and that B.C. sat
back down. B.C. later got up to get a drink of water. Appellant followed B.C. around the room. 
K.C. said that appellant had his hand under his shirt and that she thought he had the gun in that
hand. B.C. testified that appellant did have the gun in his hand and was pointing it at B.C. When
B.C. again returned to his seat, appellant returned the gun to the backpack. K.C. said she saw
appellant putting the gun back in his pack and that he gave her a threatening look.

 Shortly thereafter, the two girls met at the water fountain and agreed that they must
tell their teacher. The girls went to the teacher and told her that appellant had a gun in his
backpack. The teacher testified that she could tell from the girls' demeanor that they were
serious. The teacher sent the girls back to their seats and announced to the class that anyone who
still had a backpack needed to put it away in the closet in accordance with classroom rules.

 B.C. testified that appellant looked sad and angry when told to put the backpack
away and that appellant hesitated before doing so. S.F. testified that appellant seemed nervous
and was shaking and that when appellant returned from putting the pack in the closet, he was
crying and said he did not want to go to jail. B.C. also testified that appellant was crying and said
he did not want to go to jail and that appellant also said that he thought he was disturbed.

 After appellant placed his backpack in the closet, the teacher called the school's
assistant principal who came to the classroom and asked appellant to get his backpack and come
with her outside. The assistant principal asked the teacher to go with them as a witness. Outside,
the assistant principal asked appellant if he had brought something to school that he should not
have, and appellant said yes. She asked appellant if she could see what it was. Appellant
unzipped the pocket of the backpack, and both the teacher and the principal saw a gun. 
Appellant's eyes became red, as though he were about to cry, and he told the school officials that
the gun was a toy. The assistant principal told appellant he would have to go to the office and that
his parents would be notified.

 In the office, the assistant principal took the gun out of the backpack and told
appellant it seemed too heavy to be a toy. Appellant admitted that the gun was not a toy. The
assistant principal returned the gun to the backpack and placed the pack in the school vault. She
then conferred with the school principal who told her to notify the Austin Independent School
District Police.

 While waiting for the police, the assistant principal asked appellant why he had
brought the gun to school. Appellant said he could not tell her but agreed to write it down. 
Appellant wrote the following note, which was admitted into evidence.


It all started when I wanted to be a marine for the U.S.A. I couldn't become a
marine until I finished coll[e]ge. So I would daydream about becoming a soldier. 
Then it hit me. Why did I have to be old. I was going to do something stupid and
drastic[;] I was going to get my father[']s gun and bluff the police. I was going to
ask for a list of terrorist group[s] and a vehic[]le with better weapons. I was going
to take down other terrorist groups with help. I won[']t mention their names.



 At some point after appellant began writing the note, he asked the assistant
principal whether he was disturbed. She replied that normal people do not bring weapons to
school, and appellant began to cry.

 When the AISD officer arrived, he spoke briefly with the assistant principal and
then removed the gun from the vault. He described the gun as a Glock nine millimeter semi-automatic and testified that it contained a clip with eleven bullets and a twelfth bullet was in the
chamber ready to be fired. The officer testified that he went to appellant's classroom, where
appellant's teacher gave him an "electrical shocking device" that she had found in appellant's
desk. The officer arrested appellant and took him to Gardner-Betts detention facility, where
intake personnel discovered another nine millimeter bullet in appellant's pocket during a pat down
and search.

 On October 23, 1998, appellant was charged with engaging in delinquent conduct. 
The petition alleged one count of possession of a weapon in a forbidden location, i.e., a school. 
See Tex. Penal Code Ann. § 46.03 (West 1994); Tex. Fam. Code Ann. § 51.03. The petition
also included one count of aggravated assault, relating to B.C. See Tex. Penal Code Ann. §
22.02; Tex. Fam. Code Ann. § 51.03. Finally, the petition alleged two counts of terroristic threat
relating to S.F. and K.C. See Tex. Penal Code Ann. § 22.07; Tex. Fam. Code Ann. § 51.03.

 On the motions of both the State and appellant, the juvenile was evaluated by
psychiatrists. All of the doctors recognized that the juvenile was suffering from some type of
mental disorder at the time of the offense. In January 1999, appellant filed a motion to establish
his affirmative defense of lack of responsibility for his conduct and requested that the court try
the issue. See Tex. Fam. Code Ann. § 55.05 (West 1996). (1) The issue of appellant's
responsibility was tried in conjunction with his adjudication on April 29 and 30, 1999.

 During the course of the hearing, evidence was adduced indicating that appellant
had a fixation for weapons and the military, often reading books on the topics, and that prior to
the incident appellant's father had a number of weapons in the family home, as well as books on
the topics of warfare and weaponry. Expert testimony indicated that appellant had notions of
fighting terrorists and that he suffered from some form of psychosis either as a result of severe
depression or due to the onset of schizophrenia. One expert testified that schizophrenics often
become fixated on their delusions and lose touch with their surroundings. Appellant's teacher
testified that prior to the incident, appellant was well behaved and gave no indication of having
any special needs.

 In connection with appellant's claim of lack of legal responsibility for his conduct,
the juvenile court stated on the record, "I do not find from the preponderance of the evidence that
at the time you had the -- you lacked substantial capacity to appreciate the wrongfulness or to
conform your conduct to the requirements of the law." The court also stated on the record that
the State had not proven beyond a reasonable doubt that appellant "had a mental capacity to
violate Section 46.03 of the Penal Code by taking the weapon to school." The court did find
beyond a reasonable doubt that appellant committed the two terroristic threats and the aggravated
assault and rendered a judgment on those counts. Following the disposition hearing, the court
ordered appellant to spend five years' probation in the custody of his parents. The juvenile then
filed this appeal.


DISCUSSION


 Appellant raises four issues on appeal. He contends that the trial court erred by
failing to find that he lacked legal responsibility for his conduct. He further argues that the
evidence is factually insufficient to establish each of the three offenses of which he was
adjudicated delinquent.


Responsibility for Conduct

 Texas law provides that a child who is alleged to have engaged in delinquent
conduct "is not responsible for the conduct if at the time of the conduct, as a result of mental
illness or mental retardation, he lacks substantial capacity either to appreciate the wrongfulness
of his conduct or to conform his conduct to the requirements of law." Tex. Fam. Code Ann.
§ 55.05. 

 Appellant acknowledges that the record contains some evidence suggesting that he
was able to appreciate the wrongfulness of his conduct. Appellant instead focuses his attention
and argument on the second prong of the test, contending that the evidence shows his thought
disorder was "the motivator and orchestrator of his conduct." In other words, appellant argues
that he established as a matter of law his lack of capacity to conform his conduct to the
requirements of law or alternatively that the trial court's failure to find that he lacked capacity is
against the great weight and preponderance of the evidence.

 We will review the record to determine whether it includes evidence establishing
that appellant was unable to conform his conduct to the requirements of the law with respect to
the behavior for which he was held responsible--i.e., the three offenses for which he was
adjudicated to have engaged in delinquent conduct.

 We review a trial court's findings for legal and factual sufficiency of the evidence
by the same standards as the evidence supporting a jury's answer. See Catalina v. Blasdel, 881
S.W.2d 295, 297 (Tex. 1994); Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist., 981
S.W.2d 483, 485 (Tex. App.--Austin 1998, no pet.). When an appellant contends that a
proposition on which he had the burden that was not accepted was established as a matter of law,
we first examine the record for evidence that supports the ruling that was made, ignoring all
evidence to the contrary. See Sterner v. Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989);
Circle C, 981 S.W.2d at 485. Only if there is no evidence supporting the finding, do we then
examine the entire record to determine if the contrary proposition has been established as a matter
of law. See Sterner, 767 S.W.2d at 690; Circle C, 981 S.W.2d at 485. In reviewing factual
sufficiency, we consider and weigh all of the evidence and will reverse the decision only if the
finding is so against the great weight and preponderance of the evidence as to be manifestly
unjust. See In re. C.C., 13 S.W.3d 854, 859 (Tex. App.--Austin 2000, no pet.) (on rehearing)
(citing In re K.L.C., 972 S.W.2d 203, 206-07 (Tex. App.--Beaumont 1998, no pet.)).

 Appellant had the burden to prove by a preponderance of the evidence that, at the
time of the incident, he lacked the capacity to conform his conduct to the requirements of law. 
We will first review the record to see whether it contains any evidence that the juvenile had the
capacity to control and conform his conduct to the law he is charged with violating. We believe
the following evidence reflects some capacity to conform. However, assuming there is no
affirmative evidence of that fact, we believe the evidence does not support appellant's contention
that he proved as a matter of law that he lacked capacity.

 The following colloquy between the court and psychiatrist Emilie Becker occurred
near the end of the hearing. We believe it summarizes both the evidence and reasoning that led
to the court's ruling both on the lack of responsibility issue and the alleged offenses.


THE COURT: The psychosis that one goes through, does that automatically make
them not capable of being held accountable or responsible for their actions or
changing their action?


THE WITNESS: No, ma'am. Schizophrenics commit crimes all the time and
know they're crimes.


THE COURT: Could they stop themselves?


THE WITNESS: Sometimes. I mean, it just depends if the crime is in response
to a delusion, it's harder. If the crime is not -- because they're hungry and they
steal food, they still know it's wrong.

THE COURT: Is it possible for part of a crime to be part of a delusion, and
thereafter the rest of it be intentional?


THE WITNESS: Yes.


THE COURT: Example, if it is true that God told the child to bring the gun to
school, and bringing the [gun] on a school campus, which is a crime --


THE WITNESS: Yes.


THE COURT: -- could he perhaps not be accountable for that crime?


THE WITNESS: If then he --


THE COURT: If he felt like that's what he had to do.


THE WITNESS: If he felt like God was telling him what he had to do, and he felt
the authority of God outweighs the authority of the school, then he was doing what
he thought was right.


THE COURT: And thereafter, however, if other acts of aggression, with no
indications of voices telling him to do --


THE WITNESS: Right.


THE COURT: -- could that have been self-preservation?


THE WITNESS: Very well might have been.


THE COURT: And intentional.


THE WITNESS: And intentional. Oftentimes, these things are not cut and dry
and black and white, they're sort of commingled, and mental illnesses fluctuating --
I mean, can fluctuate within hours.


THE COURT: When a child is in a delusional state, such as we're talking about
here, to do the type of behavior we're talking about here, to do the type of
behavior we're talking about, would one expect any other exterior or factors to
manifest themselves, anything else, would any other abnormal behavior come out,
maybe in a little more withdrawn, maybe angry, anything?


THE WITNESS: Well, specifically, if it's in response to delusions, sometimes
you can get evidence of a delusion, Well, this is for God, or this is for my mother,
or letters or communications that are evidence that --


THE COURT: At the time.


THE WITNESS: At the time. It's -- or at the time, or preceding it, or subsequent
to, or -- I mean, I think the man continued to write letters to Jody Foster for years
after he was incarcerated. He didn't quite get it.


THE COURT: There's no doubt from the diagnosis that the child has psychosis
or some issues that ha[ve] to be dealt with, correct?


THE WITNESS: That's correct; or at least has had one.


THE COURT: It is also possible for a young man with his age and maturity, and
intellect, to be using that as an excuse for his behavior?


THE WITNESS: I think it's definitely possible.


THE COURT: You just don't know.


THE WITNESS: I just don't know. You know, what happened with this
evaluation is, I was sort of stun-felt [sic] into this. I really wasn't looking for it,
and was really just trying to do diagnosis and treatment, and my evaluation about
diagnosis led into the state about questioning -- question about mental state.


THE COURT: Would it be normal for a client to give three different stories about
the timing of the voices to three different doctors?


THE WITNESS: If someone is hearing voices, they sometimes are -- I mean,
mentally unstable, they all -- they're not always consistent.


THE COURT: Even if they have become mentally stable through whatever
medication?


THE WITNESS: You would expect more consistency with regard to the story as
to what happened.


THE COURT: They start becoming consistent?


THE WITNESS: Right. They're thinking.


THE COURT: Instead of less.


THE WITNESS: Thinking becomes more sequential and logical, and --


THE COURT: Thank you, Doctor. Thank you for being here.



 As indicated by the preceding exchange, the record contains evidence that voices
told appellant to take the gun to school, but it does not suggest voices told him to do more. Both
psychiatrists who interviewed appellant indicated that the voices told appellant to take the gun to
school but did not state that the voices told him to assault B.C. or threaten S.F. and K.C. The
psychologist who evaluated appellant within a few days of the incident testified that appellant gave
no indication that voices were related to the incident. Neither did he indicate that appellant's
condition propelled him into a certain course of conduct and instead stated, "[I]t wasn't like the
kid was going there, intending to do specific things. He was going to do general things that had
to do with this notion about being an anti-terrorist . . . ."

 Also, the evidence indicates that appellant told a different story regarding the voices
to each of the doctors who testified. On October 19, 1998, appellant told psychologist David
Poole that he had heard voices once or twice a year for as long as he could remember, but "he
at no point asserted that the voices had participated in the alleged act in any direct or immediate
way." In December, appellant told Becker that he had been hearing the voices once or twice a
week, that the frequency increased to daily shortly before the incident, and that on the day of the
incident a God-like voice told him to "do what I did." In her report, Becker stated that appellant
"thought the voice . . . was God telling him to bring the weapon[;] so he did what it said to do." 
(Emphasis added.) In January 1999, appellant told psychiatrist Robert Dobyns that a voice had
told him to take a gun to school twice in the year before the incident and that beginning a month
before the incident, appellant began hearing voices once or twice a week. Appellant told Dobyns
that "[h]e heard these voices a day prior to the incident but not the day of the incident." 

 Regarding appellant's general condition, Poole testified that he feared appellant was
suffering from childhood schizophrenia but stated that people who are in the early stages of
schizophrenia are not likely to be actively psychotic at all times. He indicated that delusional
schizophrenics act inappropriately because they become "sort of involved in whatever they think
is going on . . . and they're not aware or sensitive to the context." Poole testified that if appellant
were in the early stages of schizophrenia, it would not take very much to break his schizophrenic
focus and "bring [him] back to reality." Poole stated that appellant's condition was "not a real
hard and crusted paranoid kind of delusion. It's pretty flimsy. It doesn't take much to sort of get
in there and make contact . . . ." He stated that appellant had a "fragile thought process, and it
falls apart pretty easily."

 Both Becker and Dobyns admitted that one can suffer from schizophrenia and still
have lucid moments. They admitted that if a person gives inconsistent answers when asked the
same question, the person might be manipulative. Poole said appellant might feel justified in his
conduct yet still understand the nature of the consequences of his actions. Both Poole and Becker
agreed that the mental illness did not necessarily mean appellant could not control his actions.

 Given the fact that there is no evidence linking the voices to the acts for which
appellant was adjudicated delinquent, the conflicting nature of the evidence regarding the voices,
and the evidence that appellant's delusional focus could probably have been easily broken, we
hold that appellant's lack of capacity for the conduct for which he was adjudged delinquent was
not established as a matter of law. Also, evaluating the entire record and the evidence of
appellant's condition, we further hold that the court's refusal to find that appellant lacked capacity
was not so against the great weight and preponderance of the evidence as to be clearly wrong or
unjust. We overrule appellant's first issue.


Terroristic Threat

 In his second and third issues, appellant contends that the evidence is factually
insufficient to support his adjudication for the offense of terroristic threat against S.F. and K.C. 
Appellant argues that he did not threaten either girl with an offense involving violence and that
the State failed to establish that appellant had the specific intent to place either girl in fear of
imminent bodily injury because of his "impaired judgment and confused thought on that date."

 The portions of the State's petition involving each girl are identical and charge that
"the said child violated . . . Section 22.07 of the Texas Penal Code (Terroristic Threat), in that
he did then and there threaten to commit an offense involving violence to a person, namely
[complainant], with intent to place the said [complainant] in fear of imminent serious bodily
injury, by threatening to kill her." This language follows that of section 22.07(a)(2). See Tex.
Penal Code Ann. § 22.07(a)(2).

 Appellant first contends that he made no threat directed towards S.F. or K.C. of
any offense involving violence. We disagree.

 S.F. testified that appellant gave B.C. permission to tell S.F. and K.C. about the
gun. S.F. further testified that appellant said he had the gun because "he was going to take the
class hostage." The record clearly indicates that both S.F. and K.C. were members of the class. 
A hostage is "[a]n innocent person held captive by one who threatens to kill or harm him if
demands are not met." Black's Law Dictionary 738 (6th ed. 1990) (emphasis added). Thus,
appellant's threat to take the class hostage was a threat of violence directed towards S.F. and K.C.
as members of the class. In addition, K.C. and B.C. both testified that appellant said he would
shoot anyone who tried to stop him. S.F. could not remember appellant's specific threats, but she
remembered being threatened and feeling afraid. Thus, the record indicates that a second, albeit
veiled, threat of violence was directed toward S.F. and K.C. 

 Section 22.07 provides that "[a] person commits an offense if he threatens to
commit any offense involving violence to any person or property with intent to: . . . (2) place any
person in fear of imminent serious bodily injury . . . ." Tex. Penal Code Ann. § 22.07(a). When
a statute is unambiguous, we must give effect to the plain meaning of its words unless doing so
would lead to an absurd result. See Cannady v. State, 11 S.W.3d 205, 217 (Tex. Crim. App.
2000); Boykin v. State, 818 S.W.2d 782, 785-86 (Tex. Crim. App. 1991); Uribe v. State, 7
S.W.3d 294, 296 (Tex. App.--Austin 1999, pet. ref'd). We presume that when the legislature does
not include certain words in a statute, it excludes them for a reason. See Uribe, 7 S.W.3d at 296. 
The statute makes no distinction between direct and indirect threats. We therefore conclude that
appellant's indirect threats were sufficient.

 Appellant further argues that the State adduced insufficient evidence to prove that
appellant intended to put S.F. or K.C. in fear of imminent serious bodily injury.

 The State is not required to prove that the accused made an actual admission of his
own specific intent. See Hadnot v. State, 884 S.W.2d 922, 925 (Tex. App.--Beaumont 1994, no
pet.). The requisite intent for terroristic threat can be inferred from appellant's acts, words, and
conduct. See Beltran v. State, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980); Poteet v. State,
957 S.W.2d 165, 167 (Tex. App.--Fort Worth 1997, no pet.). The record establishes that
appellant knew that S.F. and K.C. were aware he had a gun at the time he threatened to take the
class hostage and to shoot anyone who tried to interfere. From appellant's words and conduct,
the trier of fact could infer that appellant intended to place S.F. and K.C. in fear of imminent
serious bodily injury.

 We hold that the finding that appellant made terroristic threats is not so against the
great weight and preponderance of the evidence as to be manifestly unjust. We therefore overrule
appellant's second and third issues.


Aggravated Assault

 In his fourth issue, appellant asserts that the State "must present legally and
factually sufficient evidence to prove beyond a reasonable doubt that [appellant] had the specific
intent to violate the law in question despite his impaired judgment and confused thought on that
date."

 Intent and knowledge are questions for the trier of fact and are almost always
proven through evidence of the circumstances surrounding a crime. See Manrique v. State, 994
S.W.2d 640, 649 (Tex. Crim. App. 1999) (citing Robles v. State, 664 S.W.2d 91, 94 (Tex. Crim.
App. 1984)). The fact finder may infer intent from any facts which tend to prove its existence,
including the accused's acts, words, and conduct. See id. (citing Hernandez v. State, 819 S.W.2d
806, 810 (Tex. Crim. App. 1991)). To determine legal sufficiency in a juvenile case, we view
the evidence in the light most favorable to the finding and determine whether any rational trier
of fact could have found the elements of the offense beyond a reasonable doubt. See C.C., 13
S.W.3d at 858 (quoting In re M.S., 940 S.W.2d 789, 791-92 (Tex. App.--Austin 1997, no writ)). 
For factual sufficiency, we determine whether the finding is so against the great weight and
preponderance of the evidence as to be manifestly unjust. See id. at 859.

 The petition alleged that "the said child violated . . . Section 22.02 of the Texas
Penal Code (Aggravated Assault), in that he did then and there by using a firearm, a deadly
weapon, knowingly and intentionally threaten imminent bodily injury to [complainant]." This
language follows that of sections 22.01 and 22.02. See Tex. Penal Code Ann. §§ 22.01(a)(2),
.02(a)(2) (West 1994 & Supp. 2000).

 B.C. testified that appellant had shown him the gun and told him he would shoot
B.C. when B.C. said he was going to tell the teacher appellant had a gun. B.C. also testified that
appellant began to remove the gun from his backpack when B.C. made an attempt to inform the
teacher. Finally, B.C. testified that appellant followed him around the room, pointing the gun at
him. All of this evidence indicates that appellant knowingly and intentionally used the gun to
threaten B.C. with imminent bodily injury. We hold that the evidence is legally and factually
sufficient to establish that appellant intentionally and knowingly assaulted B.C. using a firearm, 
and we overrule appellant's final issue.


CONCLUSION


 Having overruled all of appellant's issues on appeal, we affirm the judgment of the
juvenile court.



 


 Marilyn Aboussie, Chief Justice

Before Chief Justice Aboussie, Justices Jones and Yeakel 

Affirmed

Filed: July 13, 2000

Do Not Publish

1. The legislature recently made substantial revisions to Family Code Chapter 55 governing
proceedings for juveniles with mental illness or mental retardation. See Act of June 19, 1999,
76th Leg., ch. 1477, § 14, eff. Sept. 1, 1999. Because the legislature explicitly stated that "the
change in law made by this Act applies only to conduct that occurs after the effective date of this
Act," we will apply the law as it existed prior to the revisions, and all references to Chapter 55
will be to the former statute. Id. § 39(a).


adduced insufficient evidence to prove that
appellant intended to put S.F. or K.C. in fear of imminent serious bodily injury.

 The State is not required to prove that the accused made an actual admission of his
own specific intent. See Hadnot v. State, 884 S.W.2d 922, 925 (Tex. App.--Beaumont 1994, no
pet.). The requisite intent for terroristic threat can be inferred from appellant's acts, words, and
conduct. See Beltran v. State, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980); Poteet v. State,
957 S.W.2d 165, 167 (Tex. App.--Fort Worth 1997, no pet.). The record establishes that
appellant knew that S.F. and K.C. were aware he had a gun at the time he threatened to take the
class hostage and to shoot anyone who tried to interfere. From appellant's words and conduct,
the trier of fact could infer that appellant intended to place S.F. and K.C. in fear of imminent
serious bodily injury.

 We hold that the finding that appellant made terroristic threats is not so against the
great weight and preponderance of the evidence as to be manifestly unjust. We therefore overrule
appellant's second and third issues.


Aggravated Assault

 In his fourth issue, appellant asserts that the State "must present legally and
factually sufficient evidence to prove beyond a reasonable doubt that [appellant] had the specific
intent to violate the law in question despite his impaired judgment and confused thought on that
date."

 Intent and knowledge are questions for the trier of fact and are almost always
proven through evidence of the circumstances surrounding a crime. See Manrique v. State, 994
S.W.2d 640, 649 (Tex. Crim. App. 1999) (citing Robles v. State, 664 S.W.2d 91, 94 (Tex. Crim.
App. 1984)). The fact finder may infer intent from any facts which tend to prove its existence,
including the accused's acts, words, and conduct. See id. (citing Hernandez v. State, 819 S.W.2d
806, 810 (Tex. Crim. App. 1991)). To determine legal sufficiency in a juvenile case, we view
the evidence in the light most favorable to the finding and determine whether any rational trier
of fact could have found the elements of the offense beyond a reasonable doubt. See C.C., 13
S.W.3d at 858 (quoting In re M.S., 940 S.W.2d 789, 791-92 (Tex. App.--Austin 1997, no writ)). 
For factual sufficiency, we determine whether the finding is so against the great weight and
preponderance of the evidence as to be manifestly unjust. See id. at 859.

 The petition alleged that "the said child violated . . . Section 22.02 of the Texas
Penal Code (Aggravated Assault), in that he did then and there by using a firearm, a deadly
weapon, knowingly and intentionally threaten imminent bodily injury t