**ORAL ARGUEMENT REQUESTED**

NO. PD-0482-15

**COURT OF CRIMINAL APPEALS OF TEXAS**

ALFRED JAMES WILLIAMS,                                    Appellant

v.

THE STATE OF TEXAS,

_____

On Appeal from the 350th District Court
of Taylor County, Texas
Cause No. 10,254 (Hon. Thomas M. Wheeler)

and

NO. 11-12-00335-CR

from the
THE COURT OF APPEALS FOR THE ELEVENTH JUDICIAL DISTRICT
EASTLAND, TEXAS

**PETITION FOR DISCRETIONARY REVIEW**
_____

RECEIVED IN
COURT OF CRIMINAL APPEALS

June 2, 2015

ABEL ACOSTA, CLERK

FREDERICK T. DUNBAR
State Bar #24025336
4542 Loop 322, Suite 102
Abilene, Texas 79602
Ph:   (325) 437-7000
Fax: (325) 437-7007

ATTORNEY FOR APPELLANT

1

# TABLE OF CONTENTS

**Page**

Table of Contents …………………………...………….…….…….2

Table of Authorities …………………………………...…………...3

Statement Regarding Oral Argument…………….…..……..……….5

Statement of the Case …………………………...………..…………6

Statement of Procedural History …………………..….……………6

Statement of Issues Presented…………...…………………….………6

**Issue One**

**The Court of Appeals erred in holding the trial court acted within its discretion in denying his Motion for Mistrial, as the State thrice violated a motion in limine, characterizing Appellant as a murderer in a murder case.**

**Issue Two**

**The Court of Appeals erred in subtracting from the detailed and specific statutory language of Tex. Pen. Code Ann. § 9.3l(b)(5)(A), and erred in holding any error was harmless.**

**Issue Three**

**The Court of Appeals erred in holding Appellant was not harmed by a Brady violation.**

Argument and Authorities…………………………………….……..7

Prayer for Relief…………………………………………….……….28

Certificate of Compliance …………………………………….……29

Certificate of Service …………………………………….………..30

Appendix………………………………….…………………...………31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App.1985)............25

*Baker v. State,* 11-10-00329-CR, 2012 WL 5988900 (Tex. App. ‒ Eastland November 29, 2012, no pet.) ................................................................ 14

*Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim. App. 1991)............16

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1 194, 10 L.Ed.2d 215 (1963)......passim

*Carmen v. State,* 276 S.W.3d 538, 546 (Tex. App. ‒‒Houston [1st Dist.] 2008, pet. ref d) .................................................................................25

*Coe v. State,* 683 S.W.2d 431, 435-36 (Tex.Crim.App.1984) ..............12

*Ex parte Reed,* 271 S.W.3d 698, 726 (Tex.Crim.App.2008) .................26

*Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App.2002).............26

*Hawkins v. State,* 135 S.W.3d 72, 77 (Tex.Crim.App.2004)...................9

*Hernandez* v. *State,* 309 S.W.3d 661, 664 (Tex. App.-Houston (14th Dist.] 2010, pet. ref'd)…………………………………………………15

*Hill v. State,* 817 S.W.2d 816, 817 (Tex.App.--Eastland 1991, pet. ref d) ...................................................................................................... 11

*Hinojosa* v. *State,* 4 S.W.3d 240, 253 (Tex.Crim.App.1999) ................ ..8

*Janney v. State*, 938 S.W.2d 770, 773 (Tex. App. Houston [14[th] Dist.] 1997, no pet.)………………………………………………………..8,12

*Lee v. State,* 259 S.W.3d 785, 789 (Tex.App.-Houston [1st Dist.] 2007, pet. ref'd)………………………………………………………...15

*Lockett* v. *State,* 744 S.W.2d 229, 231 (Tex.App.--Houston [14th] Dist.I 987, pet. ref'd)………………………………………………………..11

*McGinn v. State,* 961 S.W.2d 161, 165 (Tex. Crim. App. 1998) ..........13

*Mosley v. State.,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998)……….13

3

*Palmer v. State,* 902 S.W.2d 561, 565 (Tex. App.—Houston [1st Dist.] 1995, no pet)……………………………………………………………26

*Richards* v. *State.* 912 S.W.2d 374, 379 (Tex.App.-Houston [14th Dist.] 1995, pet. ref d)……………………………………………………11

*Robinette  v. State,* 816 S.W.2d 817, 819 (Tex.App.--Eastland  1991, no pet.) ..................................................................................11

*Scruggs v. State,* 782 S.W.2d 499, 500-503 (Tex.App.--Houston [1st Dist.] 1989, pet. ref d)…………………………………………………...11

*Tate v. State*, 762 S.W.2d 678, 681 (Tex.App.--Houston [1st Dist.] 1988, pet. granted)………………………………………………………….11

*Thompson v. State,* 89 S.W.3d 843, 850 (Tex.App.-Houston [1st Dist.] 2002, pet. ref d)…………………………………………………………..7

## <u>Statutes</u>

TEX. PEN.CODE ANN. §9.31  (b)(5)(A)…………………………...2,7,15

## <u>Secondary Authority</u>

"discussion." *Merriam-Webster.com.*  Merriam-Webster,  2013. Web. 28 June 2013 .........................................................18

"explain." *,Merriam-Webster.com.*  Merriam-Webster,  2013. Web. 28 June 2013 .........................................................18

"seek." *Merriam-Webster.com.*  Merriam-Webster,  2013. Web. 28 June 2013 .........................................................17

NO. PD-0482-15

_____

## COURT OF CRIMINAL APPEALS OF TEXAS

_____

ALFRED JAMES WILLIAMS,                                  Appellant

v.

THE STATE OF TEXAS,

_____

On Appeal from the 350th District Court
of Taylor County, Texas
Cause No. 10,254 (Hon. Thomas M. Wheeler)


and

NO. 11-12-00335-CR

from the
THE COURT OF APPEALS FOR THE ELEVENTH JUDICIAL DISTRICT
EASTLAND, TEXAS

## PETITION FOR DISCRETIONARY REVIEW
_____

## TO THE HONORABLE COURT OF CRIMINAL APPEALS:

ALFRED JAMES WILLIAMS, (sometimes referred to as "Appellant,")

submits this Petition for Discretionary Review, and would respectfully show unto

the Court the following:

## **STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is requested because this case involves vital issues of State

and Constitutional law, as well as fundamental fairness, including the important policy considerations attending the willful and repeated violation of an order in limine regarding jury argument, and the construction of an important statute regarding self-defense.

## STATEMENT OF THE CASE

Williams was charged by indictment with the murder of Kerion Harness. (CR 15). The offense was alleged to have been committed on October 18, 2011. (CR: 15). On October 7, 2012, the jury found appellant guilty. (CR: 38). Punishment, assessed by the jury on October 8, 2012, was twenty-five (25) years confinement in the Texas Department of Criminal Justice- Institutional Division and no fine. (CR: 97).

## STATEMENT OF PROCEDURAL HISTORY

Appellant appealed to the Eleventh Court of Appeals at Eastland, Texas, complaining of the trial court's denial of his motion for new trial due to improper jury argument, the submission of a limiting instruction on self-defense in the jury charge, and in the trial court's overruling of Appellant's *Brady* complaint. In a memorandum opinion released on March 31, 2015, authored by the honorable Mike Willson, the Court affirmed Appellant's conviction. (Apx. 1).

## STATEMENT OF ISSUES PRESENTED

6

**Issue One**

**The Court of Appeals erred in holding the trial court did not err in denying his Motion for Mistrial, as the State thrice violated a motion in limine, characterizing Appellant as a murderer in a murder case.**

**Issue Two**

**The Court of Appeals erred in subtracting from the detailed and specific statutory language of Tex. Pen. Code Ann. § 9.3l(b)(5)(A), and erred in holding any error was harmless.**

**Issue Three**

**The Court of Appeals erred in holding Appellant was not harmed by a Brady violation**

## ARGUMENT AND AUTHORITIES

**Issue One Restated**

**The Court of Appeals erred in holding the trial court did not err in denying his Motion for Mistrial, as the State thrice violated a motion in limine, characterizing Appellant as a murderer in a murder case.**

The law provides for, and presumes, a fair trial free from improper argument by the State. Thompson v. State, 89 S.W.3d 843, 850 (Tex. App.-Houston [1st Dist.] 2002, pet. ref'd). There are four permissible areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to the argument of opposing counsel, and (4) pleas for law enforcement.

7

It is improper to refer to a defendant by a derogatory term designed to subject him to personal abuse. *Schumacher v. State*, 72 S.W.3d 43, 49 (Tex.App.-Texarkana 2001, pet. ref'd).

A denial of a motion for mistrial is reviewed under an abuse of discretion standard. See *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A mistrial is required if the impropriety is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury." *Hinojosa v. State*, 4 S.W.3d 240, 253 (Tex. Crim. App. 1999). This presumption may apply *even* where the instruction follows violation of an order in limine. *Janney v. State,* 938 S.W.2d 770, 773 (Tex.App.-Houston [14th Dist.] 1997, no pet.). (emphasis added).

To evaluate whether the trial court abused its discretion in denying a mistrial for improper jury argument, three factors are balanced: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the

8

conviction). *Hawkins v. State,* 135 S.W.3d 72, 75 (Tex.Crim.App. 2004).

Mistrial is the appropriate remedy when the objectionable events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *Id.* Looking at the facts of this case, the comments were not curable.

The State agreed to the Defendant's Motion in Limine that he could not call Appellant names other than his given name or nicknames, and the Court so ordered. (RR3: 5-6). The prosecutor twice called Appellant a "murderer," the second time just moments after the Court had sustained an objection to his use of the word the first time. (RR6: 55). Thus, the first time the prosecutor was flouting the Court's order in limine to which the prosecutor agreed, and the second he flouted the order in limine and an immediate prior ruling regarding the matter. (RR6: 55).

This is on top of the State's comment that the defense wanted the jury to devalue life, yet another disparaging comment outside the record which drew a timely objection and instruction to disregard, with a subsequent motion for mistrial denied by the trial court.(RR6: 54). Claiming that the

defense wanted the jury to devalue life is effectively calling Appellant a "murderer."

In summary, the prosecutor not only twice flouted the Court's order in limine on name-calling, he called the Appellant a "murderer" twice in a murder trial, the second time being the last substantive thing that was said to the jury by either counsel, thereby exacerbating its prejudicial impact. (RR6: 55). This is on top of a recent instance of accusing the defense of wanting the jury to devalue life, presumably an attack on both defense counsel and Appellant. This is not an isolated instance of an irrelevant insult of a defendant. This is twice calling the accused a "murderer" in a murder trial, shortly after saying he wants the jury to devalue life. These disparaging remarks go to the very issue the jury is to decide. This factor weighs in favor of mistrial.

As far as the curative measures go, they seem somewhat appropriate and on point, but given the extreme nature of the misconduct, Appellant would contend they are not sufficient to cure the prejudice, and the above comments are sufficiently egregious to be rightly deemed incurable.

Regarding the first prong, Appellant is charged with murder, so the

impact of the improper comments is high. (CR: 15). This is a case where the issue of self- defense had solid support in the evidence. There was abundant evidence from several witnesses that Kerion was very aggressive, spoke of shooting, and went to his car as if to get a gun. (RR3: 35, 41,52, 54, 57-9,85, 98, 121-2,139-140; RR5: 21,23, 40-2). Therefore, Appellant had a viable self-defense argument, and the evidence on this issue was far from being overwhelming against Appellant.

Therefore, this factor goes in favor of mistrial.

The Eastland Court of Appeals itself Court has held more than once that a denial of mistrial was an abuse of discretion when a trial court ruling was violated more than once by the State; *Robinette v. State,* 816 S.W.2d 817, 819 (Tex.App.--Eastland 1991, no pet.); *Hill v.State,* 817 S.W.2d 816, 817 (Tex.App.--Eastland 1991, pet. ref 'd).

In *Lockett v. State*, 744 S.W.2d 229, 231 (Tex.App.--Houston [14th] Dist.1987, pet. ref'd). *Tate v. State*, 762 S.W.2d 678, 681 (Tex.App.--Houston [1st Dist.] 1988, pet. granted); *Scruggs v. State*, 782 S.W.2d 499, 500-503 (Tex.App.--Houston [1st Dist.] 1989, pet. ref'd), and *Richards v. State*, 912 S.W.2d 374, 378 (Tex. App.-Houston [14th Dist.] 1995, pet. ref'd), the Courts ascribed

considerable significance to whether or not an order in limine had been disobeyed by the State. The *Janney* Court implicitly acknowledged this by using the word "even" in qualifying its statement about the curative power of Court instructions following a limine violation. *Janney,* supra, at 773.

Technically, after Appellant's objection, the trial court instructed the prosecutor and not the jury, and then trial counsel moved for mistrial without asking for an instruction to disregard. (RR6: 55). Jumping the gun from objection to a request for mistrial without the intermediate step of asking for an instruction to disregard is not necessarily waiver. *Coe v. State,* 683 S.W.2d 431, 435-36 (Tex.Crim.App.1984 ). Appellant would contend under the facts of this case, since the Court did give an instruction, albeit to the prosecutor and not the jury, and given that the exact same issue had been addressed in the prescribed procedure just moments before, the issue should be held to be preserved. The Court of Appeals held that it was. (Apx. 1).

However, to the extent the Court of Criminal Appeals believes that the trial counsel failed to preserve the issue by not asking for an instruction to disregard, this actually changes the analysis very little in effect, because failing to request an instruction to disregard is not fatal if the prejudicial effect

is incurable by a limiting instruction. *McGinn v. State,* 961 S.W.2d 161, 165 (Tex. Crim. App. 1998). As stated above, and for the reasons set forth above, Appellant contends the prosecutorial statements here to be incurable.

The State may argue in trying to distinguish some of the above cases that the harm analysis has changed to a Rule 44.2(b) analysis. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Appellant would contend under the facts of this case that does not require a different result, and the underlying considerations are the same. The bottom line is that based on the above authorities, it is well- established that a defendant has a right not to be assailed by disparaging terms during his trial, and that multiple violations of court orders regarding a prejudicial matter are far more serious than an isolated instance. It should also be axiomatic that orders in limine serve a purpose and should be obeyed. What are these strictures worth if a prosecutor can flout them this many times with impunity?

It is illogical to recognize the importance of orders in limine and forbidding name-calling and then to allow repeated violations of these

13

policies with impunity, especially where these violations are the last things the jury hears, and they go to the very issues to be decided. Indeed, the Eastland Court of Appeals recently quoted *Orona v. State,* 791 S.W.2d 125, 130 (Tex. Crim. App. 1990), noting the concern of "whether declaring the error harmless would encourage the State to repeat it with impunity." *Baker v. State,* 11-10-00329-CR, 2012 WL 5988900 (Tex. App. – Eastland November 29, 2012, no pet.).

That concern is clearly present here, and the Court of Appeals' recent quote of *Orona* shows that though harm analysis may have changed, the underlying policy considerations have not. Yet the court of Appeals in our instant casr held the error harmless. (Apx. 1). Finding a lack of prejudice in this case would vitiate the integrity of the trial process itself. This was a case that could have gone either way based on these facts, and the prosecutor's conduct was repeated, extreme, went to the very issue in the case, and was the last thing the jury heard before deliberations. Orders in limine and the right to a trial free from personal attacks from the State are worth little if prejudice is not found in this case.

14

## Issue Two Restated

***The Court of Appeals erred in subtracting from the detailed and specific statutory language of Tex. Pen. Code Ann. § 9.3l(b)(5)(A), and erred in holding any error was harmless.***

A charge limiting a defendant's right to self-defense under TEX. PEN.CODE ANN. § 9.3l(b)(5)(A) is properly given when (1) self-defense is an issue; (2) there are facts in evidence that show that the defendant sought an explanation from or discussion with the victim concerning their differences; and (3) the defendant was unlawfully carrying a weapon. *Lee v. State,* 259 S.W.3d 785, 789 (Tex.App.- Houston [1st Dist.] 2007, pet. ref"d). *Hernandez v. State,* 309 S.W.3d 661, 664 (Tex. App.-Houston [14th Dist.] 2010, pet. ref"d).

The trial court included an instruction in the charge limiting Appellant's right to self-defense under TEX. PEN.CODE ANN. § 9.31(b)(5)(A). (CR: 77).

Appellant timely objected to inclusion of this instruction, which was overruled. (RR6:4-5).

When attempting to discern legislative intent or purpose, a Court necessarily focuses its attention on the literal text of the statute in

15

question and attempts to discern the fair, objective meaning of that text at the time of its enactment. *Boykin v. State,* 818 S.W.2d 782, 785 (Tex.Crim.App. 1991). This is because the text of the statute is the law in the sense that it is the only thing actually adopted by the legislators, probably through compromise, and submitted to the Governor for her signature. *Id.* The Court focuses on the literal text also because the text is the only definitive evidence of what the legislators (and perhaps the Governor) had in mind when the statute was enacted into law. *Id.* There really is no other certain method for determining the collective legislative intent or purpose at some point in the past, even assuming a single intent or purpose was dominant at the time of enactment. *Id.* Yet a third reason for focusing on the literal text is that the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted. *Id.*

Thus, if the meaning of the statutory text, when read using the established canons of construction relating to such text should have been plain to the legislators who voted on it) a Court ordinarily gives effect to

that plain meaning. *Id.* Where the statute is clear and unambiguous the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute. *Id.*

The statute in question that limits self-defense is strikingly specific, using many specific terms. The definitions of these terms bear analysis.

The word "seek" is defined thus:

1: to resort to :go to
2    *a* :to go in search of : look for
     *b* : to try to discover

3: to ask for :request <.*seeks* advice>
4: to try to acquire or gain :aim at <.*seek* fame>
5: to make an attempt :try —used with *to* and an infinitive

    2
*a* : to be sought

*b* :to be lacking <in critical judgment ...they were sadly to *seek*

"seek." *Merriam-Webster.com.* Merriam-Webster, 2013.
Web. 28 June 2013.

The word "explain" is defined thus:

1 *a* :to make known <*explain* the secret of your success>

17

*b* :to make plain  or understandable  <footnotes that *explain* the  terms>

2: to give the reason  for or cause of <unable to *explain* his strange   conduct>

3: to show  the  logical development   or  relationships   of  <*explained* the  new

theory>

**_intransitive_**

:to make something plain  or understandable  <a report that suggests rather   than

*explains>*

:to clarify one's statements or the reasons for one$^1$s conduct

"explain." *Merriam-Webster.com.* Merriam- Webster,
2013. Web. 28 June 2013.

Discussion  is defined as follows:

l :consideration of a question  in open and usually  informal  debate

2: a formal treatment of a topic in speech or  writing

"discussion." *Merriam-Webster.com.* Merriam-Webster,  2013.
Web. 4 July 2013.

Clearly, the statute requires affirmative acts of trying to engage the

other party regarding the subject of disagreement while unlawfully carrying,

not merely going where one knows that party will be and responding to his

mouthing.

A review of the germane facts is as follows:

According to the testimony of Demarques, on October 18, Appellant and Demarques were going to Dallas, and parked Demarques' car by the complex dumpster to clean it out. (RR3: 30-1). Kerion then pulled up in a confrontational mood. (RR3: 33). After threats from Kerion, Appellant went to his baby's mother's house. (RR3: 34-5). His exchanges were with Flo. (RR3: 39-41, 64). Kerion swore and went to the car. (RR3: 41, 65). His girlfriend said "Don't get that" and then the shooting occurred. (RR3: 41 J 52, 65).

Jackie Lenius affirmed Kerion and she pulled up by Demarques and Appellant at the dumpster, Kerion was perturbed because he believed Demarques to be looking for him. (RR3: 82).

Kerion told Demarques that Demarques was looking for him, he was not going to talk but going to shoot. (RR3: 85). She asked Appellant if he were going to shoot in front of her kids, he responded affirmatively. (RR3: 86). Kerion said "okay," "okay," and then reached for his driver door. (RR3:87-88). It was Demarques, not Appellant, that Kerion confronted at the

scene. (RR3: 97). She never saw Appellant leave the scene. (RR3: 98). Appellant was not involved in any arguments that preceded the shooting on the 18th. (RR3: 99). That he would shoot were the last words Kerion uttered before he reached for the car door and got shot. (RR3: 98).

Florence "Flo" Patterson next testified for the State. He was friends with Harness. (RR3: 104). They had known each other in Louisiana. (RR3: 104). On October 17th, he had gotten into an argument with Appellant. (RR3: 105). They had two arguments over his owing Appellant $200. (RR3: l06). Appellant did pull out a gun but put it up at D-Train's insistence. (RR3: 106-7). He saw D-Train and Kerion at the apartment complex the next day arguing, and Appellant dropped by 15 to 20 minutes later. (RR3: 109).When he ran over there he heard a gun cock, so he ran away. (RR3: 110).

Shortly after he got back down there, he saw A.J. arrive. (RR3: 111). Appellant had a gun in his backside. (RR3: 111). There was a lot of arguing. (RR3: 111).

Appellant pulled out a gun. (RR3: 11 1). Kerion said something, though he couldn't remember what. (RR3: 112). Kerion ran to his car, and Flo thought he was going for a gun. (RR3: 112). He never saw Kerion with a

20

gun. (RR3: 112). Appellant then shot him. (RR3: 112). Kerion leaned into the car when Appellant shot him. (RR3: 113).

Flo testified Appellant had two fights with Flo, and Appellant had the advantage. (RR3: 115). Kerion had come to his aid. (RR3: 115). Kerion's attitude was that he was going to continue the dispute from the previous day with Appellant and Demarques. (RR3: 118). He affirmed he thought Kerion was going for a gun when he moved to his car because of the altercations going on. (RR3: 121-2). Kerion ran toward the car and leaned down. (RR3: 122-3). That's when he heard the shots. (RRJ: 123). After being shown his statement, he c1arified that Appellant had shown his pistol, but not pointed it at him. (RR3: 127).

Easter Marshall testified that on the 18th she and Flo had gone to get something to eat, and then pulled up on D-Train and Kerion at the garbage cans. (RR3: 136).

Flo got out walk to them while after she parked and remained a bit back. (RR3: 136-7). She could not hear what was being said. (RR3: 137).

Appellant showed up later. (RR3: 138). She saw his gun. (RR3: 138).

21

"They," meaning everyone there, were arguing, but she could not hear what anyone was saying. Appellant put a clip in the gun after "they" had argued a while. (RR3: 139). Kerion was walking toward his open car door when Appellant shot him. (RR3: 139-140). Kerion leaned into his car door before he was shot. (RR3: 140).

On cross-examination, the witness expressed uncertainty as to how far she was from this exchange. (RR3: 144-6). She could hear arguing but could not hear the words. (RR3: 146).

Appellant testified that as he returned to the car near the dumpster after retrieving the gun, he saw arguing, and approached. (RR5: 37). He went there to find what was going on. (RRS: 37). He was not coming to confront Kerion or Flo. (RR5: 37). Kerion and D-Train were arguing vigorously. (RRS: 38). Flo stared him down, and Appellant inquired about his money. (RR5: 38). Their disputed ended with assurances that Flo would pay Appellant. (RR5: 38-9). Kerion approached him saying that he knew Appellant but Appellant didn't know him. (RR5: 39). Kerion told him that they had gotten into on the phone about a month and a half ago because Appellant would not sell him marijuana. (RRS: 40).

Appellant testified Kerion approached him saying that he knew Appellant but Appellant didn't know him. (RR5: 39). Kerion told him that they had gotten into on the phone about a month and a half ago because Appellant would not sell him marijuana. (RRS: 40). Kerion was acting in a hostile manner. (RR5: 40). He said he wasn't talking about fighting, but shooting. (RRS: 40). Flo told Kerion that Appellant had a gun on him. (RR5: 41). It was visible to Flo. (RRS: 41). Kerion inquired of Appellant if he had a gun on him. (RR5: 41).

Appellant then responded that Kerion was talking about shooting, yet it wasn't that serious a matter. (RR5: 42). Kerion said he "ain't trying to hear all that shit. "(RR5: 42). Kerion approached with his hands out, as if to grab Appellant's gun. (RRS: 42). He reached at Appellant with one hand. (RRS: 42). Appellant took a step back and told Kerion not to walk up on him like that anymore. (RR5: 42).

Kerion said "so you got a gun and you ain't gonna use it?" He further stated "I'm gonna bust you in your ass" and he darted toward the car. (RR5: 43). Appellant interpreted this as meaning he was going to shoot him, and it scared him. (RR5: 43). The car door was open. (RR5: 43-4).

23

Jackie, standing by the passenger side of the car said to Kerion "don't do that" or "don't get that." (RR5: 44). Appellant thought Kerion was going to shoot. (RR5: 44). Kerion darted toward the car and reached down in the car. (RRS: 44). Appellant just reacted, firing the gun toward the ground, trying to make him jump. (RR5: 44). He was not trying to kill, just trying to shoot in his direction. (RRS: 45). He saw Kerion fall, and Appellant took off running. (RR5:45).

Admittedly, if the testimony of Demarques is believed, the Appellant returned with a gun to a scene where he knew Harness would be. Clearly, returning to the scene where be knew Kerion would be with a gun and mouthing back at Kerion is something that was unwise for Appellant to have done. The plain language of the statute requires more, however. lt requires that he actively engage Harness in a discussion or explanation of their differences, and that simply did not occur.

Given Appellant properly preserved error by objecting to the charge, reversal is mandated if Appellant suffered some harm by the erroneous inclusion of the

24

limiting instruction. *See Camen v. State,* 276 S.W.3d 538, 546 (Tex. App.—

Houston [1st Dist] 2008, pet. ref d).

The four-part analysis for assessing harm consists of reviewing (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *Id* at 546-7; *Almanza v. State,* 686 S.W.2d 157 171 (Tex. Crim. App. 1985).

The jury charge clearly centered largely on the issue of self-defense. (CR: 68-84). This was the only objected-to portion of the charge. (RR6: 4-5). It was the only seriously-contested issue in the case, the Appellant having conceded he shot Harness. Arguments of counsel centered on self-defense, and indeed the State flatly said "Self-defense is going to be the main issue in this case." (RR6: 32) Thus, the evidence of self-defense was strong, as set forth in the recitation of relevant facts within this issue. The State, in closing argument, emphasized its argument that Appellant had sought an explanation or discussion with Harness.(RR6: 30, 34). Clearly, harm existed in this case.

## Issue Three Restated

25

### *The Court of Appeals erred in holding Appellant was not harmed by a Brady violation*

For there to be reversible error under *Brady,* a defendant must show that

(1)   the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

(2) the withheld evidence is favorable to him;

(3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.
     *Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App.2002).

"The State" includes, in addition to the prosecutor, other lawyers and employees in his office and members of law enforcement connected to the investigation and prosecution of the case. *Ex parte Reed,* 271 S.W.3d 698, 726 (Tex.Crim.App.2008).

The defendant must show that, "in light of all the evidence, it is reasonably probable that the outcome of the trial would have been different had the prosecutor made a timely disclosure." *Hampton,* 86 S.W.3d at 612. When there has been an untimely disclosure of evidence, rather than a complete failure to disclose, the inquiry becomes whether the defendant was prejudiced by the tardy disclosure. *See Palmer v. State,* 902 S.W.2d 561, *565* (Tex. App.—

Houston [1st Dist.] 1995, no pet.).

Veronica Hardeman testified that Appellant told her he saw a friend put the gun from the car in the bushes. (RR3: 209).

Wallace McDaniel testified Sergeant Lynn Beard stated there was a rumor that someone had removed something, perhaps even a gun, from the victim's car. (RR4: 90).

Detective Moscarelli testified there was a two-hour gap in the interview tape of Veronica Hardeman. (RR4: 116-7). He took notes about Veronica saying Appellant having mentioned that someone had taken a gun from the car and put it in a bush. (RR4: 117-9).

Sergeant Lynn Beard a rumor developed about a person taking an object out of Harness' car and hiding it in a bush. (RR4: 135). Some said it was a gun. (RR4: 135). He could hear the rumor that someone had removed something, maybe a gun, maybe not, from the car, but no one was identified specifically, though he instructed the detectives to look. (RR4: 138).

Detective John Clark affirmed he did hear of such rumors days later. (RR4: 157-8). None of this information was disclosed to the Defendant prior to

27

trial. (RR3: 229-230). The prosecution conceded the Hardeman information "would be Brady" if in possession of the police. (RR3: 230-1). Failure by the State to disclose this information deprived Appellant of the opportunity to question witnesses at the apartment complex and to discover additional information about the gun. For the reasons articulated in Issues One and Two above, there is strong evidence of self-defense, and self-defense was key to Appellant's defense, so deprivation of the opportunity to find evidence that Kerion had access to a gun is prejudicial as a m a t t e r of law. The Court of Appeals held that Appellant waived this point by not requesting a continuance to further investigate. (Apx. 1). However, as any evidence was long despoiled by the passage of time, a continuance would be pointless.

## **PRAYER FOR RELIEF**

The Court of Appeals in holding Appellant was not entitled to a mistrial when he was three times impermissibly and personally attacked by the State with respect to the very thing he for which he was on trial – whether or not he committed murderer. For the State to repeat a violation of an order in limine three times with impunity is something the Court of Criminal Appeals should address as a matter of policy. Further, the Court of Appeals erred in its construction of a very

specifically worded statute, finding evidence that Appellant sought an explanation or discussion of his differences with the decedent when to do so ignores the plain meaning of the words "sought," "explanation," and "discussion," three power words the Legislature saw fit to specifically include in the statute. The evidence regarding self-defense in this case is simply too strong to hold either of these errors harmless. Additionally, the Court of Appeals erred in overruling Appellant's *Brady* issue. Accordingly, Appellant's conviction should be reversed, and this case remanded for a new trial.

Respectfully submitted,

/s/ Rick Dunbar_____
FREDERICK DUNBAR
Texas Bar No. 24025336
4542 Loop 322
Suite 102
Abilene, Texas  79602
Telephone: 325/437.7000
Facsimile: 325/437.7007

## CERTIFICATE OF COMPLIANCE

Appellant's Petition for Discretionary Review, according to the word count function of counsel for Appellant's word-processing software, contains 4341 words, excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement

29

of jurisdiction, statement of procedural history, signature, proof of service,

certification, certificate of compliance, and the appendix As this is within the limits

established, Appellant respectfully certifies compliance.

/s/ Rick Dunbar_____
Rick Dunbar

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June, 2015, a true and correct copy of the above and foregoing was forwarded to the Taylor County District Attorney and the State Prosecuting Attorney in a manner consistent with the requirements of the law.

/s/ Rick Dunbar_____
Rick Dunbar

## **APPENDIX**

Opinion of the Texas Court of Appeals, Eleventh District, At Eastland…………….…………...1



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00335-CR

_____

## ALFRED JAMES WILLIAMS, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 10254-D**

## M E M O R A N D U M   O P I N I O N

The jury convicted Appellant, Alfred James Williams, of murder. Appellant pleaded "true" to an enhancement paragraph for one prior felony conviction. The jury assessed punishment at confinement for twenty-five years, and the trial court sentenced Appellant accordingly. On appeal, Appellant asserts that the trial court erred when it (1) denied his motion for a mistrial, (2) included a limitation in the

jury instruction on self-defense, and (3) overruled his alleged *Brady*[1] claims. We affirm.

## I. *Evidence at Trial*

Appellant, Floyd Patterson (Flo), and Demarques Donte Taylor (D-Train) got into an argument one night. Appellant also got into an argument with Kerion Harness that night. All were at the Little Elm Apartments in Abilene. Their disagreements spilled over into the next day when Appellant and Kerion met in the parking lot at Little Elm Apartments. The argument ended there in that parking lot when Appellant shot and killed Kerion.

Prior to the shooting, D-Train and Appellant had decided to go to Dallas; they had parked D-Train's car next to a dumpster in the parking lot at the Little Elm Apartments to clean out the car. Jackie Lenius said that she, Kerion, and their children went to a friend's apartment at the complex and that Kerion went inside to get marihuana. As they were leaving the complex's parking lot, Kerion saw D-Train and Appellant, and he stopped his car to talk to them. D-Train heard Kerion say, "I heard you n-----s . . . came by . . . the Scroggins' house . . . looking for me." D-Train responded that he was not looking for Kerion. Kerion then said to Appellant, "I know you but you don't know me," and "I know you, n----r. You don't even know me."[2] Flo then walked up and got into an argument with Appellant over money. Appellant then walked upstairs to D-Train's apartment; Flo saw Appellant leave and return.

Surveillance equipment[3] recorded Appellant when he walked up to D-Train's apartment and returned downstairs with a handgun in his hand; he also had put on a hoodie. Flo and Appellant exchanged words about whether Appellant

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] This was apparently a reference to a prior drug deal between Appellant and Kerion.

[3] George Gonzales placed video surveillance equipment in his apartment window so he could monitor his vehicle, which had been vandalized, and he maintained a log of his recordings. Gonzales said he saw Appellant in the video come out with a gun in his hand.

2

would shoot Flo.  Appellant remarked, "You right, you d--n right . . . I got mine" as he displayed his handgun.  Flo claimed to hear Appellant "cock" his handgun.  Kerion and Appellant argued, and Kerion said, "I heard ya'll was looking for me." Kerion also said, "I'm from Louisiana; we don't fight, we shoot."  Appellant lifted his shirt and said, "you wanna shoot?" and he pulled his gun from his waistband; Lenius asked, "[A]re you gonna shoot in front of my kids?" Appellant responded, "[H]--l yeah."

Easter Marshall said that Appellant had a gun and that she saw him put a clip in it during the argument.  She said Flo, D-Train, Appellant, and Kerion were talking when Kerion leaned down near the driver's side door, which was open.  D-Train said that Kerion said, "F--k that" and turned and walked toward his car.  D-Train said that Lenius said, "Let's go; f--k that s--t; don't get that"; "[d]on't get that; let's go," as Kerion approached his car.  Lenius denied that Kerion said anything.  According to Lenius, Kerion turned and reached for the car door, which had to be opened from the inside.  As Kerion reached to open the door, Appellant shot him twice.  Kerion stumbled around his car and collapsed in the front passenger seat.

Neither D-Train nor Flo saw Kerion with a gun.  Lenius denied that Kerion threatened anyone and denied that he had a gun in the car.  Lenius and Marshall corroborated Flo's and D-Train's testimony that Appellant shot Kerion.  After the shooting, Appellant said to D-Train, "Let's go, I just shot this n----r."  Appellant ran off, but D-Train did not go with him.  D-Train drove to his grandmother's house where he was later arrested by police.  Aleshia Barnes testified that Appellant ran into her house, and asked to use the phone.  Appellant told Barnes that he had just "shot somebody," and Appellant had a handgun in his jacket.  Barnes gave him the phone; he called someone and eventually left.

Jamie McQueen testified that her cousin, Kathy Taylor, is married to D-Train and that McQueen was at the Little Elm Apartments when shots were fired; she and Taylor and their kids got into Kathy's car and left.  Once stopped in

traffic, they picked up Appellant and then drove him to another apartment complex. While in the car, Appellant said he had just shot someone. Once at the apartment, Appellant got a ride to Dallas from Veronica Hardeman;[4] he gave the gun to McQueen and Taylor, who threw it into a creek bed. They later directed police to the location of the gun.

Ernest Moscarelli, a detective with the Abilene Police Department, responded to the scene. He spoke to Lenius, interviewed Flo and D-Train, and later interviewed Taylor and McQueen. He also interviewed Hardeman twice, once in his office and once in the video room. Lynn Beard, a Sergeant with the Abilene Police Department, responded to the scene and helped interview people and searched the complex. Sergeant Tony Lassetter, a police officer with the Abilene Police Department interviewed Lenius at the scene. Detective Moscarelli interviewed Hardeman, who he suspected was untruthful in her interview. He also viewed the surveillance videotape and confirmed recovery of the gun from the creek bed.

Stephanie Hughes and Wallace McDaniel—the former, a forensic specialist, and the latter, a criminalist officer—collected evidence at the scene, which included shell casings, and recovered the gun from the creek bed. Amanda Flory, a forensic specialist with Alliance Forensics Laboratory in Fort Worth, tested the recovered handgun and the shell casings and found that they matched. Nizam Peerwani, the medical examiner, conducted an examination and autopsy of Kerion; he found no defensive wounds, but he found two gunshot wounds, one in the back and the second in the right arm. The gunshot to the back killed Kerion.

Appellant testified in his own defense and asserted that he shot Kerion because he thought Kerion was going for a gun in his car. Appellant denied he knew Kerion; testified that Kerion had threatened him the night before the shooting

---

[4]Veronica Hardeman, who was friends with Appellant, picked him up at the Pebble Creek Apartments and took him to Dallas after the shooting. Appellant told her he shot Kerion because he thought Kerion was going for a gun, but Appellant told her he never saw a gun.

4

and the day of the shooting; and explained that, when Kerion turned to go to his car and reached inside the window of the driver's door, Appellant shot him.

## II. *Analysis*

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). We must first determine whether error occurred. If so, we must then evaluate whether the error requires reversal. *Id.* at 731–32. To establish reversible error under *Brady*, a defendant must show: (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011); *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). We will address each of Appellant's issues sequentially.

### A. *Issue One: Mistrial*

Appellant argues that the trial court erred when it denied his motions for mistrial following comments made by the prosecutor in closing argument that Appellant was a "murderer" and wanted the jury to "devalue life." We apply an abuse of discretion standard during review, and we will uphold the denial of a motion for mistrial if it is within the zone of reasonable disagreement. *Archie*, 221 S.W.3d at 699 (citing *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004)). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77.

The law provides for, and presumes, a fair trial free from improper argument by the prosecuting attorney. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the

5

argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008); *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). Even when an argument exceeds the permissible bounds of these approved areas, it is not reversible unless the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial new facts harmful to the accused. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive Appellant of a fair and impartial trial. *Id.* (citing *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997)).

Instructions to the jury will generally cure most improprieties that occur during trial, and we presume that a jury will follow the judge's instructions. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). A mistrial is an appropriate remedy only in extreme circumstances and is reserved for a narrow class of highly prejudicial and incurable errors. *Hawkins*, 135 S.W.3d at 77. If the harm caused by an improper jury argument is incurable, a motion for mistrial preserves error for appellate review. *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007); *Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004). In determining whether improper jury argument warrants a mistrial, the *Mosley* court balanced three factors: (1) severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

The prosecutor asserted that Appellant wanted the jury to "devalue life" and also called him a "murderer" on three separate occasions. None of these comments were proper jury argument. *See Brown*, 270 S.W.3d at 570; *Cannady*, 11 S.W.3d at 213. Defense counsel objected the first time when the prosecutor said that Appellant wanted the jury to "devalue life"; the trial court sustained the objection

6

and provided an instruction to disregard. Appellant moved for mistrial, which was denied. When the prosecutor again gave an improper jury argument by calling Appellant a "murderer," defense counsel objected, and the court again instructed the jury to disregard and told the jury to decide the case on the evidence. Appellant again moved for a mistrial, which was denied. The third time the prosecutor gave an improper jury argument was when he called Appellant a "murderer" twice in short succession; the trial court instructed the prosecutor to "restrict the characterizations." Appellant moved for mistrial a third time, and the trial court denied the motion.

Under the first *Mosley* factor, we conclude that the prosecutor's comments were both improper and prejudicial. *See Mosley*, 983 S.W.2d at 258–60. Under the second *Mosley* factor, the trial court properly instructed the jury twice to disregard the prosecutor's comments. *Id.* at 259–60. After the second objection, the trial court essentially instructed the jury it was the jury's decision to resolve facts and determine if Appellant was guilty of the offense charged. All of these instructions cured the errors by the prosecutor, which although improper and prejudicial, were isolated and occurred in short succession. *Id.*; *see Gamboa*, 296 S.W.3d at 580.

Under the final *Mosley* factor, we observe that the prosecutor did not inject new or harmful facts into the trial and did not violate a mandatory statute. *See Mosley*, 983 S.W.2d at 258–60. His comments were made in connection with his summation of evidence at the end of his argument, in which he argued that Appellant had committed murder beyond a reasonable doubt when he shot Kerion in the back without justification. Given the evidence the State amassed against Appellant and Appellant's own testimony, we hold that the trial court did not abuse its discretion when it denied Appellant's motions for mistrial. Even if it did, any error was harmless because it was not incurable, did not affect Appellant's substantial rights, and did not deprive him of a fair trial. *Id.*; *see* TEX. R. APP. P. 44.2(b); *Hawkins*, 135 S.W.3d at 77. We overrule Appellant's first issue.

*B. Issue Two: Alleged Jury Charge Error*

Appellant asserts that the trial court erred when it included an instruction in the jury charge[5] that limited Appellant's right to self-defense under Section 9.31(b)(5)(A) of the penal code. TEX. PENAL CODE ANN. § 9.31(b)(5)(A) (West 2011). Self-defense is a justification for conduct that would otherwise be criminal. *See id.* §§ 9.02, 9.31. "[A] person is justified in using force against another when and to the degree [he] reasonably believes the force is immediately necessary to protect [himself] against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). But "[t]he use of force against another is not justified . . . if the actor sought an explanation from or discussion with the other person concerning the actor's differences with the other person while the actor was" unlawfully carrying a weapon under Section 46.02. *Id.* § 9.31(b)(5)(A). "A person commits an offense if the person intentionally, knowingly, or recklessly carries on or about his or her person a handgun . . . if the person is not: (1) on the person's own premises or premises under the person's control." *Id.* § 46.02(a)(1) (West Supp. 2014).

A charge limiting a defendant's right of self-defense is properly given when (1) self-defense is an issue, (2) there are facts in evidence that show the defendant sought an explanation from or discussion with the victim concerning their differences, and (3) the defendant was unlawfully carrying a weapon. *Id.* § 9.31(b)(5)(A); *Davis v. State*, No. 05-10-00732-CR, 2011 WL 3528256, at *10 (Tex. App.—Dallas Aug. 12, 2011, pet. ref'd) (not designated for publication); *Lee v. State*, 259 S.W.3d 785, 789 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). To determine whether the limitation was warranted, we view the evidence in the light most favorable to giving the instruction. *See Fink v. State*, 97 S.W.3d 739, 743 (Tex. App.—Austin 2003, pet. ref'd). If there is any evidence raising a

---

[5]The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case [and] not expressing any opinion as to the weight of the evidence." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). A trial court must instruct the jury on statutory defenses, affirmative defenses, and justifications when raised by the evidence. *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007).

fact issue on the limitation, an instruction should be submitted. *Bumguardner v. State*, 963 S.W.2d 171, 175–76 (Tex. App.—Waco 1998, pet. ref'd).

When we review a claim of jury charge error, we engage in a two-step process. First, we determine whether error exists, and then we determine whether sufficient harm resulted from the error to require reversal. *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009); *Olivas v. State*, 202 S.W.3d 137, 143 (Tex. Crim. App. 2006); *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). We do not reach the harm issue, however, unless we first find error in the charge. *See Barrios*, 283 S.W.3d at 350. If the error in the charge was the subject of a timely objection, reversal is required if there is some harm to the defendant because of the error. CRIM. PROC. art. 36.19 (West 2006); *Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000); *Almanza*, 686 S.W.2d at 171. Appellant objected to the inclusion of the instruction and preserved error.

Appellant was unlawfully carrying a gun when he shot Kerion, but he argues the limiting instruction was improper because he did not seek a discussion with Kerion over differences. In *Hernandez*, the court held that a trial court did not err when it submitted the instruction because Hernandez and another person, Omar, had a disagreement over who had some guns that belonged to Gilberto. *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Hernandez claimed that, although Gilberto asked him to speak to Omar, the differences were between Omar and Gilberto and that, therefore, the limiting instruction was improper. *Id.* at 64–65. The appellate court rejected that assertion and held that a discussion between Appellant and Omar satisfied the statute and that the trial court properly submitted the instruction. *Id.* at 665–66. The day before the shooting, Kerion and Appellant argued and threatened each other. The next day, while Appellant and D-Train emptied D-Train's car of trash, Kerion parked his car nearby and approached them; a short time later, Appellant went into D-Train's apartment, got a gun, and returned. Kerion asked D-Train and

Appellant if they were looking for him; D-Train said no, and Appellant argued with Kerion. Kerion said, "F--k that" and started to walk toward his car. Appellant shot Kerion in the back as Kerion leaned into his car. The trial court did not err when it submitted the instruction. *See Hernandez*, 309 S.W.3d at 665.

Even if we were to hold that the trial court erred in giving the limiting instruction, which we do not, the result would be no different. *See Ovalle*, 13 S.W.3d at 786; *Almanza*, 686 S.W.2d at 171. In evaluating whether there was some harm from jury charge error, we should consider "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Barron v. State*, 353 S.W.3d 879, 883 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171). Appellant shot Kerion following an argument. The medical examiner testified that Kerion died from a gunshot wound. The police found shell casings at the scene and recovered Appellant's gun; ballistics testing matched them to each other. No one, not even Appellant, testified that Kerion had a gun when he was shot. After a review of the evidence, the jury charge, the contested issues, and the arguments of counsel, we note that the evidence was disputed but that, even if the instruction was in error and should not have been part of the jury charge, there was no harm. We overrule Appellant's second issue.

C. *Issue Three: Alleged Brady Violation*

Appellant asserts that a *Brady* violation occurred when the State did not disclose that a witness, Veronica Hardeman—who had been told by Appellant that he saw someone get in the victim's car, get a gun, and hide the gun in the bushes—had given that information to law enforcement. Appellant also argues that a second *Brady* violation occurred when the State failed to disclose that Sergeant Beard had heard rumors about a gun in the victim's car that had been taken and hidden at the apartment complex. Both violations, Appellant claims, prejudiced him because the State suppressed material evidence that was favorable to him.

10

The State has an affirmative duty to disclose exculpatory evidence that is material either to guilt or punishment. *Brady*, 373 U.S. at 86. *Brady* requirements extend to both impeachment and exculpatory evidence, and no request is required by the defendant. *United States v. Bagley*, 473 U.S. 667 at 676–77 (1985); *United States v. Agurs*, 427 U.S. 97, 111–12 (1976); *Harm v. State*, 183 S.W.3d 403, 409 (Tex. Crim. App. 2006). Prosecutors have a duty to learn of *Brady* evidence known to others acting on the State's behalf in a particular case. *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995). The State's duty to reveal *Brady* material attaches when the information comes into its possession, not when requested. *Thomas v. State*, 841 S.W.2d 399, 407 (Tex. Crim. App. 1992).

As an initial procedural matter, when a defendant asserts during trial that a *Brady* violation has occurred, he is entitled to a recess of the trial to obtain production of the material. *Crawford v. State*, 892 S.W.2d 1, 4 (Tex. Crim. App. 1994). A defendant must request a continuance or a recess to protect due process; otherwise, the complaint about the State's failure to disclose information is waived. *Payne v. State*, 516 S.W.2d 675, 677 (Tex. Crim. App. 1974); *State v. Fury*, 186 S.W.3d 67, 74 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). A defendant's failure to request a continuance indicates the tardy disclosure was not prejudicial. *Fury*, 186 S.W.3d at 73–74. In this case, the trial court held a *Brady* hearing, and defense counsel questioned two police officers but never requested a continuance or a recess. Appellant has waived error. *Payne*, 516 S.W.2d at 677; *Fury*, 186 S.W.3d at 74.

But even if we are incorrect, and Appellant had preserved error, his *Brady* claims still fail. First, the information that Hardeman testified about came from Appellant. Appellant told her that he shot Kerion because he thought Kerion was going for a gun but that he never saw a gun. Hardeman did not cooperate with police and did not initially tell them that Appellant told her someone had taken a gun from Kerion's car and hidden it in the bushes; this occurred in a later interview. The State does not have a duty to disclose evidence, if the defendant

11

actually knew of the exculpatory evidence or could have accessed it from other sources. *Pena*, 353 S.W.3d at 810. If Appellant failed to investigate information he knew or should have known, then there is no *Brady* violation. *Dalbosco v. State*, 978 S.W.2d 236, 238 (Tex. App.—Texarkana 1998, pet. ref'd).

Second, Appellant claimed he was unaware of the rumors Sergeant Beard had heard and claimed his trial would have been different had this information been disclosed. To show a *Brady* violation, Appellant must establish that the State suppressed material evidence favorable to him. *Harm*, 183 S.W.3d at 406 (citing *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *Thomas*, 841 S.W.2d at 402–03). The materiality of the undisclosed information is not sufficiently proven by showing a mere possibility that the undisclosed information might have helped in the defense or might have affected the outcome of the trial. *Hampton*, 86 S.W.3d at 612. When evaluating whether the materiality standard is satisfied, we balance the strength of undisclosed evidence against evidence supporting the conviction. *Id.* at 613. When such evidence is disclosed during trial, the issue is whether the defendant was prejudiced by the late disclosure. *Little*, 991 S.W.2d at 867. But the question is not whether the defendant would more likely than not have received a different verdict with the undisclosed evidence, but whether, in its absence, he received a fair trial—understood as a trial resulting in a verdict worthy of confidence. *Kyles*, 514 U.S. at 434; *Pena*, 353 S.W.3d at 812 n.11. We analyze the alleged *Brady* violation in light of all the other evidence adduced at trial. *Hampton*, 86 S.W.3d at 612–13.

After the shooting, Officer Wilson spoke to Hardeman, who mentioned nothing about a gun in the bushes at the Little Elm Apartments. Later, Detective Moscarelli interviewed Hardeman twice; his notes about the second interview reflected that she claimed Appellant had told her someone had taken a gun from Kerion's car and hidden it in the bushes at the apartment complex. Detective Moscarelli questioned the validity of Hardeman's statements because she had initially denied any involvement, she was evasive and uncooperative, her

12

comments about the gun in the bushes were not specific, and she said she got the information from Appellant.

Detective Moscarelli ordered a search of the apartment complex, but a gun was never recovered there. John Clark, a detective with the Abilene Police Department, testified that he and several other officers were sent to the apartment complex after the shooting to look for a gun on the property. Officer Beard told him where to search, but no gun was recovered there. Austen Walker, a detective with the Abilene Police Department, searched the entire complex for evidence but did not find a gun there. Sergeant Beard said that, although he had heard a rumor about a gun on the property, he could get no names of people to interview about the rumor. The police did not follow up on the rumor because no witness had described the victim as having a gun at the time of the shooting.

Appellant shot and killed Kerion. He did so after he got a gun from D-Train's apartment and came back to D-Train's car to continue his argument with Kerion—an argument that ended in Kerion's murder. Appellant's gun was recovered; the shell casings matched it. No one testified that Kerion had a gun in his hand when he was shot, and his girlfriend testified there was no gun in the car. The police found no gun at the apartment complex and no witness who would corroborate the rumor, which originated with Appellant. Appellant claimed self-defense and received a self-defense instruction, but the jury decided that issue against him. Appellant has not explained how an earlier disclosure of the complained-of information prejudiced him or would have made any difference at trial. We have reviewed the evidence for and against the conviction and the evidence that Appellant claims was a *Brady* violation, and we hold there was no violation. But even if we are incorrect, Appellant was not prejudiced by the tardy disclosure. We overrule Appellant's final issue.

13

## III. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

March 31, 2015

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

14

Print this page

# Case # PD-0482-15

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 06/01/2015 11:11:56 PM |
| Case Number | PD-0482-15 |
| Case Description | |
| Assigned to Judge | |
| Attorney | Rick Dunbar |
| Firm Name | Galbreath Law Firm |
| Filed By | Frederick Dunbar |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.00 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $0.00 |
| Total Provider Tax Fees | $0.00 |
| Grand Total | $0.00 |

## Payment

| | |
|---|---|
| Account Name | Frederick Thomas Dunbar |
| Transaction Amount | $0.00 |
| Transaction Response | |
| Transaction ID | 9026647 |
| Order # | 005500871-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Petition for Discretionary Review |
| Filing Description | PDR |
| Reference Number | Bugsy |
| Comments | |
| Courtesy Copies | dyerp@taylorcountytexas.org, information@spa.texas.gov |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|

| Other | 06/02/2015 04:55:26 PM | The petition for discretionary review does not contain the identity of Judge, Parties and Counsel [Rule 68.4(a)]. You have ten days to tender a corrected petition for discretionary review. |

## Documents

| *Lead Document* | A.J. Williams PDR.pdf | [Original] |